VANESSA L. WILLIAMS, ESQ.
LAW OFFICE OF VANESSA L. WILLIAMS, P.C.
414 WEST SOLEDAD AVENUE
GCIC BLDG., SUITE 500
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-1389
EMAIL: vlw@vlwilliamslaw.com

ALEXA KOLBI-MOLINAS*
MEAGAN BURROWS*
RACHEL REEVES*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 BROAD STREET, 18TH FLOOR
NEW YORK, NY 10004
TEL: (212) 549-2633
EMAIL: akolbi-molinas@aclu.org

* APPLICATION FOR ADMISSION *PRO HAC VICE* FORTHCOMING

*Attorneys for Plaintiffs*

## IN THE DISTRICT COURT OF GUAM

SHANDHINI RAIDOO, M.D., M.P.H. and BLISS KANESHIRO, M.D., M.P.H., on behalf of themselves and their patients,

      Plaintiffs,

      vs.

LEEVIN TAITANO CAMACHO, in his official capacity as Attorney General of Guam, NATHANIEL BERG, M.D., in his official capacities as Chair of the Guam Board of Medical Examiners and member of the Commission on the Healing Arts of Guam, PHILIP FLORES, in his official capacity as Vice-Chair of the Guam Board of Medical Examiners, ARANIA ADOLPHSON, M.D., in her official capacity as member of the Guam Board of Medical Examiners, ANNETTE DAVID, M.D., M.P.H., in her official capacity as member of the Guam Board of Medical Examiners, ANNIE BORDALLO, M.D., in her official capacity as member of the Guam Board of Medical Examiners, ARTHUR SAN AGUSTIN, Director of Public Health and Social Services in his official capacity as member of the Commission on the Healing

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL CASE NO. 21-00009

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Case 1:21-cv-00009   Document 1   Filed 01/28/21   Page 1 of 46

Arts of Guam, BERNADETTE S. SANTOS, )
M.P.A., B.S.N, R.N., Chair of the Board of )
Nurse Examiners in her official capacity as )
member of the Commission on the Healing )
Arts of Guam, ANTONIO RAPADAS, )
D.D.S., Chair of the Board of Examiners for )
Dentistry in his official capacity as member of )
the Commission on the Healing Arts of Guam, )
THOMAS J. CARUSO, B.S.P., Chair of the )
Board of Examiners for Pharmacy in his )
official capacity as member of the )
Commission on the Healing Arts of Guam, )
MAMIE BALAJADIA, ED.D., Chair of the )
Guam Board of Allied Health Examiners in her )
official capacity as member of the )
Commission on the Healing Arts of Guam, )
MARLENE R. SAN NICOLAS, O.D., Chair )
of the Board of Examiners for Optometry in )
her official capacity as member of the )
Commission on the Healing Arts of Guam, )
JENNETH QUIAMBAO, Chair of the Board )
of Cosmetology in her official capacity as )
member of the Commission on the Healing )
Arts of Guam, DUSTIN PRINS, D.P.M., the )
Chief Medical Officer of the Guam Memorial )
Hospital Authority in his official capacity as )
member of the Commission on the Healing )
Arts of Guam, THERESA C. ARRIOLA, )
M.B.A., Director of the Guam Behavioral )
Health and Wellness Center in her official )
capacity as member of the Commission on the )
Healing Arts of Guam, and DOE 1, a )
representative from the Mayors Council of )
Guam in their official capacity as member of )
the Commission on the Healing Arts of Guam, )

     Defendants. )

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by their undersigned attorneys, bring this Complaint against the Defendants, and allege as follows:

# INTRODUCTION

1.  For more than 40 years, Guamanians have fought for the right to safe and legal abortion in Guam. However, today, as a result of the challenged laws, there are no known means of obtaining a legal abortion in Guam.

2.  As a result of the challenged laws, people are being forced to travel several thousand miles, at significant personal and financial cost, to Hawai'i or beyond just to exercise their constitutional right to abortion. Some, unable to afford such extensive travel, are being forced to continue their pregnancies to term against their will. Others may be using unsafe methods to terminate their pregnancies.

3.  The decision about whether, when, or how to become a parent is one of the most important and personal life decisions one can make. Every Guamanian should be able to make that decision without government-imposed barriers, without shame, and without being forced to leave their home and the support of their community to get the care they need.

4.  Laws that prohibit pre-viability abortion and/or impose a substantial obstacle in the path of a person seeking a pre-viability abortion violate longstanding Supreme Court and Ninth Circuit precedent.

5.  To ensure that the constitutionally guaranteed right to abortion can be fully realized for all Guamanians, this challenge seeks declaratory and injunctive relief against 9 G.C.A. § 31.20 and 10 G.C.A. § 3218.1 to the extent they prevent Plaintiffs, two Guam-licensed physicians, from providing abortion services to patients in Guam.

# JURISDICTION AND VENUE

6.  Plaintiffs bring this action under 42 U.S.C. § 1983 to redress the deprivation, under color of law, of rights secured by the U.S. Constitution and expressly extended to Guam under 48

U.S.C. § 1421b(u). *See Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1370 n.4 (9th Cir. 1992), *as amended* (June 8, 1992).

7.    This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

8.    Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

9.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants, who are sued in their official capacities, carry out their official duties at offices located in this district.

<u>**PARTIES**</u>

I.    <u>**Plaintiffs**</u>

10.    Plaintiff SHANDHINI RAIDOO, M.D., M.P.H., is a board-certified obstetrician-gynecologist (OB-GYN) with nearly a decade of experience providing comprehensive reproductive health care, including abortion, licensed to practice medicine in Hawai'i and Guam. Dr. Raidoo is an Assistant Professor in the Department of Obstetrics, Gynecology, and Women's Health and Complex Family Planning Fellowship Program at the John A. Burns School of Medicine, at the University of Hawai'i at Manoa. Dr. Raidoo sues in her individual capacity, on behalf of herself and her patients.

11.    Dr. Raidoo is currently able to provide non-abortion health care via telemedicine to patients in Guam.

12.    As described *infra*, Dr. Raidoo and her colleagues have safely provided medication abortion through telemedicine from O'ahu to hundreds of patients throughout the Hawaiian Islands. However, Dr. Raidoo is unable to counsel, prescribe, and provide medication abortion to

eligible patients in Guam using telemedicine, due to the risk of criminal and/or licensure penalties under the challenged statutes. *See* 9 G.C.A. § 31.20; 9 G.C.A. § 31.21; 10 G.C.A. § 3218.1.

13.     Plaintiff BLISS KANESHIRO, M.D., M.P.H., is a board-certified OB-GYN with nearly two decades of experience providing comprehensive reproductive health care, including abortion, licensed to practice medicine in Hawai'i and Guam. Dr. Kaneshiro is an Endowed Professor with Tenure in the Department of Obstetrics, Gynecology, and Women's Health at the John A. Burns School of Medicine and also the Chief of the Family Planning Division and Co-Director of the Complex Family Planning Fellowship Program at the University of Hawai'i at Manoa. Dr. Kaneshiro sues in her individual capacity, on behalf of herself and her patients.

14.     Dr. Kaneshiro is currently able to provide non-abortion health care via telemedicine to patients in Guam.

15.     As described *infra*, Dr. Kaneshiro and her colleagues have safely provided medication abortion through telemedicine from O'ahu to hundreds of patients throughout the Hawaiian Islands. However, Dr. Kaneshiro is unable to counsel, prescribe, and provide medication abortion to eligible patients in Guam using telemedicine, due to the threat of criminal and/or licensure penalties under the challenged statutes. *See* 9 G.C.A. § 31.20; 9 G.C.A. § 31.21; 10 G.C.A. § 3218.1.

II.     **Defendants**

16.     Defendant LEEVIN TAITANO CAMACHO is the Attorney General of Guam. Pursuant to 5 G.C.A. § 30109(a), Attorney General Camacho, or a deputy or assistant, "*shall* conduct on behalf of the government of Guam the prosecution of all offenses against the laws of Guam which are prosecuted in any of the courts of Guam, the District Court of Guam, and any appeals therefrom," including violations of 9 G.C.A. §§ 31.20 and 31.21 (felony criminal penalties for illegal abortions) and 10 G.C.A. § 3218.1(f) (misdemeanor criminal penalties for

violations of state-mandated information requirements). Attorney General Camacho is sued in his official capacity.

17.     Defendant NATHANIEL BERG, M.D., is Chair of the Guam Board of Medical Examiners ("GBME" or "the Board"). Defendant PHILIP FLORES is the Vice-Chair of the Board. Defendants ARANIA ADOLPHSON, M.D., ANNETTE DAVID, M.D., M.P.H., and ANNIE BORDALLO, M.D., are members of the Board. Pursuant to 10 G.C.A. § 12209(d), Defendant members of the Board are authorized to take disciplinary action against licensees for, *inter alia*, "the commission or conviction of a gross misdemeanor or a felony, related to the practice of medicine," including violations of 9 G.C.A. §§ 31.20 and 31.21 and 10 G.C.A. § 3218.1. Defendants are sued in their official capacity.

18.     Defendants[1] ARTHUR SAN AGUSTIN; BERNADETTE S. SANTOS, M.P.A., B.S.N., R.N.; NATHANIEL BERG, M.D.; ANTONIO RAPADAS, D.D.S.; THOMAS J. CARUSO, B.S.P.; MAMIE BALAJADIA, ED.D.; MARLENE R. SAN NICOLAS, O.D.; JENNETH QUIAMBAO; DUSTIN PRINS, D.M.P.[2]; THERESA C. ARRIOLA, M.B.A.; and DOE 1[3] are members of the Commission on the Healing Arts of Guam ("the Commission"). Pursuant to 10 G.C.A. §§ 11110 and 3218.1(g)(2), Defendant members of the Commission are

---

[1] Pursuant to 10 G.C.A. §§ 12103(a)(1)–(11), the Commission on the Healing Arts of Guam consists of eleven members: the Director of Public Health and Social Services, or a designee from the Department; the Chairperson of the Board of Nurse Examiners; the Chairperson of the Board of Medical Examiners; the Chairperson of the Board of Examiners for Dentistry; the Chairperson of the Board of Examiners for Pharmacy; the Chairperson of the Board of Allied Health Examiners; the Chairperson of the Board of Examiners for Optometry; the Chairperson of the Board of Cosmetology; the Chief Medical officer of the Guam Memorial Hospital Authority; the Director of the Guam Behavioral Health and Wellness Center, or a designee from the Department; and one member from the Mayors Council.

[2] On information and belief, and according to Article 9.5-1(A) of the Guam Memorial Hospital Authority ("GMHA") Medical Staff Bylaws, the GMHA Medical Staff President acts as the Chief Medical Officer.

[3] On information and belief, this position is pending appointment by the Mayor's Council of Guam.

authorized to take disciplinary action against licensees for violations of 10 G.C.A. § 3218.1. Defendants are sued in their official capacity.

## STATUTORY AND REGULATORY BACKGROUND

### Guam Abortion Statutes

19.     Abortion is legal in Guam, subject to certain regulations and restrictions. *See, e.g.*, 9 G.C.A. § 31.20 (requiring, *inter alia*, that abortions be performed by a physician in an appropriate clinical setting); 10 G.C.A. § 3218.1 (mandatory delay and state-mandated information requirement); 19 G.C.A. § 4A100 (parental consent for abortion); 10 G.C.A. § 91A102 ("partial-birth abortion" ban); *see also Ada*, 962 F.2d 1366.[4]

20.     Guam law states that abortions "may be performed" by an appropriately licensed physician in "the physician's adequately equipped medical clinic or in a hospital approved or operated by the United States or this Territory." 9 G.C.A. § 31.20(b)(2) ("Clinic Requirement"), attached hereto as Ex. A. For purposes of this statute, an abortion is defined as "the termination of a human pregnancy with an intention other than to produce a live birth or to remove a dead fetus." *Id.* at (a).

21.     The Clinic Requirement, which was enacted in 1978, does not appear to differentiate between (i) procedural abortions, which are medical procedures typically performed in a clinical setting, and (ii) medication abortions, which are not procedures at all, and were not available at the time this requirement was enacted. *See infra* ¶¶ 127–46. As discussed *infra*, in a

---

[4] Because this lawsuit solely concerns abortions performed prior to 13 weeks "after the commencement of pregnancy," *see infra* ¶ 135, Plaintiffs do not challenge the portion of Guam law that prohibits certain abortions after this point. *See* 9 G.C.A. § 31.20(b)(3). However, those prohibitions are largely unenforceable. *See, e.g., Ada*, 962 F.2d at 1372–74; *Isaacson v. Horne*, 716 F.3d 1213, 1227 (9th Cir. 2013) ("Under controlling Supreme Court precedent, a woman has a right to choose to terminate her pregnancy *at any point* before viability. . . and the State may not proscribe that choice."); *see also id.* at 1222 (prohibitions on post-viability abortion must contain exception "where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother") (quoting *Roe v. Wade*, 410 U.S. 113, 164–65 (1973)).

medication abortion the patient ingests certain medications, 24–48 hours apart, at a time and location of their choosing, to induce a process virtually identical to an early miscarriage. *See* ¶¶ 130–32.

22.     Failure to comply with the Clinic Requirement is a third-degree felony. 9 G.C.A. § 31.21. Failure to comply with the Clinic Requirement could also lead to medical licensure penalties. *See, e.g.*, 10 G.C.A. § 12209(d)(3) (grounds for disciplinary action include "the commission or conviction of . . . a felony [] related to the practice of medicine, or the entry of a guilty or nolo contendere plea to a . . . felony charge").

23.     Guam law also imposes a 24-hour mandatory delay and in-person, state-mandated information requirement on all abortion patients, except in medical emergencies. *See* 10 G.C.A. § 3218.1 ("State-Mandated Information Law"), attached hereto as Ex. B.

24.     The State-Mandated Information Law, which was enacted in 2012, defines abortion to include, *inter alia*, "the use or prescription of any instrument, medicine, drug, or other substance or device to terminate the pregnancy of a woman known to be pregnant with an intention other than to increase the probability of a live birth." 10 G.C.A. § 3218.1(a)(1).

25.     The State-Mandated Information Law requires that, *inter alia*, at least 24-hours prior to an abortion, the physician who is to perform the abortion or a "qualified person" provide the patient with certain information "in person," "individually," and "in a private room." *Id.* at (b)(1), (b)(2), and (b)(4).

26.     The State-Mandated Information Law appears to supersede Guam's general informed consent statute. *Compare* 10 G.C.A. § 11104 (consent to surgical or medical procedures) *with* 10 G.C.A. § 3218.1(b) ("Except in the case of a medical emergency, consent to an abortion is voluntary and informed *if and only if*" certain statutory requirements are fulfilled) (emphasis added).

27.    Failure to comply with the State-Mandated Information Law can result in misdemeanor penalties, professional disciplinary action, and other civil and administrative claims available under common or statutory law (including wrongful death). *Id.* at (f)–(g).

28.    In addition, Guam law imposes numerous reporting requirements on physicians performing abortions. For example, within seven days of performing an abortion, a physician must complete, sign, and submit an "individual abortion report" to the Office of Vital Statistics of the Department of Public Health and Social Services ("DPHSS"). 10 G.C.A. §§ 3218 (a), (c). This report includes demographic information about the patient, along with the physician's name and the facility at which the abortion was performed. *Id.* at (a).

29.    Based on these reports, the Guam Registrar of Vital Statistics is required to publish annually, *inter alia*, the name of every facility to have provided an abortion in the past year, along with the number of abortions performed at each such facility. *Id.* at (e).[5]

30.    Failure to complete an individual abortion report for each abortion within seven days from the date of the abortion is a misdemeanor, and may also lead to sanctions, disciplinary or other actions by the GBME. *Id.* at (k)–(l).

31.    Each patient is also required to certify, in writing, that they received the state-mandated information at least 24-hours prior to the abortion, and the total number of those certifications must be reported monthly to the Guam Memorial Hospital Medical Records Section ("Records Section"). *See* 10 G.C.A. § 3218.1(b)(5). The Records Section is required to make the number of certifications received available to the public on an annual basis. *Id.*

32.    Failure to obtain and/or report the total number of these certifications can result in misdemeanor penalties, professional disciplinary action, and other civil and administrative claims available under common or statutory law (including wrongful death). *Id.* at (f)–(g).

---

[5] *See also* Guam Bureau of Stat. & Plans, *2018 Guam Statistical Yearbook* 205–08 (2019), http://www.spc.int/DigitalLibrary/Get/o5r7x.

33.     These reporting requirements are not being challenged in this lawsuit.

## Telemedicine

34.     Guam law permits Guam-licensed physicians, including those located in other jurisdictions, to practice within Guam by electronic or other such means. *See generally* Guam Att'y Gen. Op. No. 17-0351 (Nov. 6, 2017).

## FACTUAL ALLEGATIONS

### Abortion in Guam

35.     Historical, ethnographic and linguistic evidence dating back to the 18th century shows that, over time, women in Guam and throughout the region have utilized a variety of methods to induce miscarriage or end their pregnancies, as well as to practice birth control and other methods to control their fertility.

36.     More recently, and for nearly five decades, Guamanians have fought to ensure and maintain access to safe and legal abortion on the island.

37.     At the time of the Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113 (1973), abortion in Guam was defined as a crime for both the person performing the procedure and for the woman who solicited or consented to it, except in cases where it was necessary to preserve the woman's life or health. Like most Guam laws at the time, the criminal abortion law was based on the 1930 California Penal Code.

38.     Some people in Guam nevertheless found ways to access abortion care during this time. For those who could afford it, legal abortions could be obtained by flying either to Japan or to Hawai'i; others obtained illegal abortions in Guam. However, the lack of legal abortion meant that others were forced to carry their pregnancies to term.

39. In 1978, Senator Concepcion Barrett proposed and successfully amended the penal code to de-criminalize abortion. That statute, 9 G.C.A. § 31.20, *see supra* ¶¶ 19–22, remains the law—and unchanged—to this day.

40. In 1989, Senator Elizabeth Arriola introduced a law outlawing abortion, which was even more restrictive than the pre-1978 law. Much of the opposition to that ban came in the form of women's personal stories about the importance of abortion access to their lives.

41. For example, one woman gave a personal account of becoming pregnant at 27 years old as a result of contraceptive failure. She testified that her husband abandoned her, but she chose not to terminate her pregnancy: "My choice was right for me, but it would not have been right for many other women who found themselves unexpectedly pregnant and did not have the resources to fall back on that I had."

42. Organized opposition also came from the Guam Nurses Association (GNA). For example, appearing at a legislative hearing in her capacity as the President of the GNA, now-Governor Leon Guerrero, testified that the Ban "totally ignores individual human rights, decreases access to health care, and increases the potential for adversity in the human condition."

43. Governor Leon Guerrero later expressed that it was concern for her own daughter that was the deciding factor for her to speak out against the ban: "The bottom line that made me decide to do it . . . was this: . . . If this bill becomes law . . . what does that mean? That means that if my child was raped . . . and she went to have an abortion and found that she could not, she's going to come to me and say, 'Mom, what did you do to fight for my right as a woman to decide on my own?' . . . And that's when I said . . . even if it loses, the consoling thing for me is that I tried my best. And that's all I can say to my daughter."

44.    The ban ultimately became law on March 19, 1990. According to a local grassroots pro-choice organization, the last legal abortions performed in Guam before the ban took effect were for two girls, aged 10- and 12-years old.

45.    Four days later, on March 23, 1990, a lawsuit was brought on behalf of Maria Doe (a pseudonym), representing herself and all other women who needed abortions or counseling and information, along with a number of other plaintiffs including the Guam Society of Obstetricians and Gynecologists.

46.    Maria Doe, who already had one child, was eight weeks pregnant. Her abortion, which had been scheduled for March 20 in Guam, had been canceled and she had been told by multiple doctors that they could not help her because of the ban. She testified that she had already had to borrow money from a friend to afford the procedure and could not afford to go to Japan, Hawai'i, or elsewhere to obtain an abortion.[6]

47.    Numerous other individuals also submitted testimony concerning the impact of the ban. For example, Rita Lujan Bevacqua, R.N., the Nursing Director at the Seventh Day Adventist Clinic in Guam (who succeeded Governor Leon Guerrero as President of the GNA), testified about a man who called the clinic after the ban took effect. His wife was pregnant, and they already had six children, but he was too afraid to leave his name or come in to talk about their situation, or even for his wife to come in and have a pregnancy test; he just wanted them to tell him what he could do for his wife, as they felt they could not have any more children.[7]

48.    A woman in the Navy, also testifying pseudonymously (because the Navy would not permit her to use her real name), explained that she had previously obtained an abortion from

---

[6]  See Decl. of Maria Doe (1990), attached hereto as Ex. C, Att. 1.

[7]  Decl. of Rita Lujan Bevacqua (1990) ¶ 10, attached hereto as Ex. C, Att. 2.

a local provider in Guam and would not have been able to afford to fly to Hawai'i if the ban had been in effect at the time.[8]

49.      Another woman, testifying pseudonymously because she believed she and her husband "would suffer adverse consequences if my true name was revealed," explained that she was first married at 18 years old and had three children born within a year of each other, even though she did not want and was not emotionally prepared for a family. She later separated from her husband, remarried, and had a planned pregnancy. When that child was eight months old, she became pregnant again due to contraceptive failure. She chose to have an abortion because she felt strongly that having another child at this time would have such a negative effect on her ability to care for her existing children, explaining "I did what was right and best for me" and "I have not regretted it." Had she been pregnant when the ban took effect, she said she would have done "whatever it takes to have an abortion."[9]

50.      One young woman testified that "I do not know if I will ever have an abortion, but I do know that if I ever became pregnant, I would want the freedom of choice to decide whether to have an abortion. As a result of this law, I do not have the same right to control my body as boys or men have to control their bodies. It makes me feel that my decision-making abilities are not respected and that my body and my life are not fully my own."[10]

---

[8] Decl. of Betsy Ross Doe (1990) ¶¶ 3–4, attached hereto as Ex. C, Att. 3; *see also* Decl. of Cathy Jones, R.N. (1990) ¶¶ 4–5, attached hereto as Ex. C, Att. 4.

[9] Decl. of Evangelista Doe (1990) ¶¶ 2–5, attached hereto as Ex. C., Att. 5.

[10] Decl. of Brindha Muniappan (1990) ¶ 3, attached hereto as Ex. C, Att. 6.

51.     Other health care providers, including a social worker and former nun, also testified about the importance of abortion access to the lives of their clients and their families, as well as the impact of being denied that access.[11]

52.     For example, Bevely Olson, a Mental Health-Psychiatric Nurse, testified about the extreme measures people in Guam have taken when unable to access legal abortion. She described one 19-year-old woman who made multiple attempts to induce an abortion, including: drinking one-fifth of a bottle of whisky; taking an overdose of aspirin; asking her boyfriend to punch her in the abdomen, which he did; asking her nieces and nephews to jump on her stomach, which they did; and running her car off the road. Because these attempts failed, she was forced to give birth against her will. She also described a woman who had been forced to give birth when she was only 10 years old and whose baby had been presented to the community as her sibling, and the devastating long-term effect of being "locked into a secret that she could not reveal to anyone."[12]

53.     Other health care providers in Guam testified that they had heard from patients that consuming whole bottles of alcohol or soy sauce will induce an abortion and described patients who drank peroxide or vinegar or took an overdose of Tylenol to cause their own abortion.[13]

54.     The ban was ultimately enjoined and struck down by the district court as unconstitutional; the Ninth Circuit upheld that decision, and the Supreme Court declined to hear the case. *See Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 776 F. Supp. 1422 (D. Guam

---

[11] *See, e.g.*, Decl. of Patricia Stahlnecker, R.N. (1990), attached hereto as Ex. C, Att. 7; Decl. of Bevely Olson (1990), attached hereto as Ex. C, Att. 8; Decl. of Carol O'Donnell (1990), attached hereto as Ex. C, Att. 9.

[12] Olson Decl. ¶¶ 3, 7–8, 10.

[13] Jones Decl. ¶ 3; Stahlnecker Decl. ¶ 10.

1990), *aff'd*, 962 F.2d 1366 (9th Cir. 1992), *as amended* (June 8, 1992), *cert. denied*, 506 U.S. 1011 (1992).

55.     Abortion has remained legal in Guam since the 1990 abortion ban was enjoined.

56.     Between 2008–17, approximately 200–300 abortions were provided in Guam each year.[14]

57.     Based on the abortion methods reported, between 2008–17, at least 85% of abortions performed in Guam—if not more—occurred in the first or early second trimester.[15]

58.     Nearly 60% of people who obtained abortions in Guam between 2008–17 identified as Chamorro.[16]

59.     On average, the majority of people who obtained abortions in Guam between 2008–17 already had at least one child.[17]

60.     Prior to 2018, it was extremely rare for Plaintiffs or their colleagues in Hawai'i to see abortion patients from Guam. Plaintiffs estimate they saw such patients once a year or less— usually those patients came to Hawai'i because of a rare fetal anomaly that required a consultation with a specialist.

61.     In 2016, one of the only two physicians known to provide abortions in Guam retired. In 2018, the last known physician (Dr. Freeman) to provide abortions in Guam retired, leaving no known abortion provider of abortions on the island.[18]

---

[14] Guam Bureau of Stat. & Plans, *supra* note 5, at 205–08.

[15] *See id.* at 206.

[16] *Id.* at 207.

[17] *Id.* at 208.

[18] Jasmine Stole Weiss, *No Abortion Providers on Guam*, Pac. Daily News (June 30, 2018), https://www.guampdn.com/story/news/2018/06/30/no-abortion-providers-guam/744847002/, attached hereto as Ex. C, Att. 10.

62.     According to media reports, no abortions were reported in Guam between June 2018 and June 2019.[19]

63.     Plaintiffs first became aware that the last abortion provider in Guam retired in 2018 from news articles.

64.     Around the same time, Plaintiffs and their colleagues started receiving inquiries from people in Guam who needed access to abortion, as well as from doctors in Guam on behalf of their pregnant patients. Plaintiff Raidoo reached out to the physician who took over Dr. Freeman's clinic and he informed her they would no longer be providing abortion services.

65.     Many hospitals and medical practices in Guam have stated publicly that they not only do not provide abortions, but also that they will not even refer patients for abortions.[20]

66.     Anti-abortion stigma discourages even supportive local doctors from incorporating abortion services into their practice.

67.     After reaching out to other physicians and advocates in Guam, Plaintiffs have become aware of supportive physicians who are willing to provide pre- and post-abortion care but have been unable to identify anyone willing and able to provide abortion services directly. These supportive physicians have expressed fear of retaliation and protests if they do start providing abortions.

68.     The reporting requirement and publication of statistics, including the names of every facility where abortions are performed, ultimately makes it impossible for local doctors to keep the fact that they provide abortions secret.

---

[19] The Associated Press, *Guam Catholic Group Protests Recruitment of Abortion Doctors*, ABC News (June 15, 2019), https://abcnews.go.com/Health/wireStory/guam-catholic-group-protests-recruitment-abortion-doctors-63738886, attached hereto as Ex. C, Att. 11.

[20] *See* Weiss, *supra* note 18.

69.    Governor Leon Guerrero, who actively supports restoring abortion access to Guam, has recognized the extent to which stigma against abortion makes it difficult to find local doctors in Guam willing to provide the service.[21]

70.    In fact, Governor Leon Guerrero's statement to the press that she supports recruitment of a doctor to provide abortions in Guam was not only met with a protest by a local anti-abortion group, but legislation was presented to existing senators that would have prohibited the government from engaging in such recruitment.[22]

## Impact of the Lack of Abortion Access in Guam

71.    On information and belief, there are no known providers of legal abortion in Guam.

72.    Currently people in Guam are being forced to travel to Hawai'i or mainland United States to exercise their constitutional right to abortion.

73.    Requiring Guamanians or Guam-based U.S. servicemembers to travel to Hawai'i or mainland United States to exercise their right to abortion imposes tremendous obstacles in the path of those seeking an abortion.

74.    These burdens fall disproportionately on Chamorro women and women who already have at least one child, who are the majority of people who have abortions in Guam. *See supra* ¶¶ 58–59.

75.    Moreover, data already show that a majority of abortion patients are poor or low-income and poverty is a significant problem in Guam: According to recent data from the U.S.

---

[21] Caleb Jones, *Abortions Are Legal in Guam, but Doctors Won't Perform Them*, AP News (June 7, 2019), https://apnews.com/c2537d19a3024554baa5e617d5381c9c, attached hereto as Ex. C, Att. 12; *see also* The Associated Press, *supra* note 19.

[22] Jolene Toves, *Bill Drafted to Stop Hiring of Abortion Doctor*, Pac. News Ctr. (June 19, 2019), https://www.pncguam.com/bill-drafted-to-stop-hiring-of-abortion-doctor, attached hereto as Ex. C, Att. 13.

Census Bureau, the poverty rate for Guam is approximately 22.5%, which is higher than the highest poverty rate (19.6%) among the 50 states and District of Columbia.

76.     The out-of-pocket cost to obtain an in-person abortion in Hawai'i ranges from $400–$700 in the first trimester to as much as $3,000–$7,000 in the second trimester. Thus, the longer it takes to come up with the funds for the abortion procedure, the more expensive the procedure may become.[23]

77.     Federal Medicaid only covers abortion in cases of rape or incest or if the pregnancy is life-threatening.  *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. H, §§ 506–07, 134 Stat. 1182, 1622 (2020). Moreover, in Plaintiffs' experience, even those patients from Guam with private insurance usually do not have coverage for abortion.

78.     In addition to the cost of the procedure itself, a Guam-based patient will face significant travel costs. A single round-trip economy ticket for a commercial flight between Guam and Hawai'i costs approximately $1,500. Moreover, given the length of the flight, time difference, and general limited availability of flights, unless a patient has friends or family they can stay with, they are likely to have to pay for at least one night in a hotel as well.

79.     At a minimum, patients who work will need to take multiple days off of work to travel and obtain care. Patients without access to paid sick leave may also face lost wages for each day they need to take off of work to travel and obtain abortion care.

80.     Patients who have children may also face difficulty arranging and/or paying for childcare for each day they need to travel and obtain abortion care.

---

[23] As discussed below medication abortion using telemedicine is much less expensive, *see infra* ¶ 183, but is currently unfeasible in Guam due to the challenged laws, *see infra* ¶¶ 190–216.

81.     Given the costs, need to take time off of work, and childcare obligations, some patients may have no option but to travel alone, without their partner, a supportive friend, or family member.

82.     There are also intangible costs to traveling off-island for care. For example, it is much more difficult to keep the decision to have an abortion secret, or known only to a trusted few, if one has to request time off from work and/or explain taking a sudden, expensive trip to Hawai'i. This is especially difficult for people experiencing intimate partner violence ("IPV").

83.     Further, the COVID-19 pandemic has added new layers of complexity and risk to travelling for accessing health care. From an infection control perspective, air travel imposes risks on the individual travelling and their household, as well as on recipient clinics and health providers.

84.     Even patients who are permitted to travel may be subject to extensive quarantines in Hawai'i and/or Guam, which may require even more time off of work and need for alternative childcare arrangements, which in turn makes it even more difficult to keep the abortion decision private. For example, at the time of filing, anyone traveling to Hawai'i must submit proof of a negative COVID-19 test result (from an FDA-authorized "trusted testing" partner) within 72 hours of departure and complete and submit a travel questionnaire 24 hours before departure; anyone arriving without proof of a negative test result will be subject to a mandatory 10-day quarantine.[24] Patients who test positive for COVID-19 also may not be permitted to travel at all.[25]

_____

[24] *See generally Travel Requirements*, The Hawaiian Islands, https://www.gohawaii.com/travel-requirements (last visited Jan. 27, 2021); *Safe Travels: Mandatory State of Hawaii Travel and Health Form*, State of Hawaii, https://travel.hawaii.gov/#/ (last visited Jan. 27, 2021).

[25] *See, e.g.*, Julia Jacobo, *Hawaii Couple Arrested After Boarded Flight Knowing They Had COVID-19*, ABC News (Dec. 2, 2020), https://abcnews.go.com/US/hawaii-couple-boarded-flight-knowing-covid-19-arrested/story?id=74510096, attached hereto as Ex. C, Att. 14.

85. Likewise, at the time of filing, anyone returning to Guam—including residents— is subject to a 14-day quarantine at a government facility, unless the individual qualifies for one of the narrow exemptions, in which case they can quarantine at an approved rental lodging or personal residence.[26] For example, to obtain a discretionary exemption to allow home quarantine for "a recent medical procedure or surgery" after returning from obtaining an abortion in Hawai'i, an individual would need to be assessed by a government staff member and offer documentation and information disclosing the abortion procedure. Even if approved, the exemption could take "several days," during which time even a Guam resident must stay in the government facility.[27]

86. At least one of Plaintiffs' patients has already been subject to mandatory quarantine upon returning to Guam after traveling to Hawai'i for an abortion; it was two weeks before this patient could see her family again.

87. Additionally, there is a dignitary harm when, even though they are U.S. citizens with a constitutional right to abortion, Guamanians are forced to travel to Hawai'i or beyond just to exercise their constitutional rights and access essential health care.

88. The lack of local abortion access also presents distinct obstacles for U.S. servicemembers stationed in Guam.

89. According to the U.S. Department of Defense, there are 12,000 military members and their families stationed in Guam.

90. Federal law already restricts military treatment facilities from providing abortions, and military insurance from providing coverage for abortion, except in cases where the pregnancy

---

[26] *Mandatory Quarantine Guidelines Effective August 21, 2020*, Guam Dep't of Pub. Health & Soc. Servs., http://dphss.guam.gov/quarantine/ (last visited Jan. 27, 2021).

[27] Memorandum from the Guam Dep't of Pub. Health & Soc. Servs., Additional Guidance Relative to Executive Order No. 2020-34 (Sept. 25, 2020), https://dphss.guam.gov/wp-content/uploads/2020/09/DPHSS-Guidance-Memo-2020-11-Rev10-1.pdf (last visited Jan. 27, 2021).

is life-threatening or the result of rape or incest. *See* 10 U.S.C. § 1093.[28] Thus, most servicemembers have no choice but to obtain abortion care off-base and to pay out-of-pocket for that care.

91.     However, Plaintiffs have spoken to servicemembers seeking abortions who are prohibited from leaving Guam altogether during the pandemic. Even under non-pandemic conditions, to undertake the nearly 8,000-mile round-trip, likely multi-day journey to Hawai'i would require express permission from one's chain of command, which could be denied for any reason. Moreover, particularly for enlisted personnel who live on a limited income, the travel and out-of-pocket procedure costs would also present a significant obstacle.

92.     If access to abortion in Guam is not restored, some Guamanians and servicemembers will simply be unable to overcome these logistical and financial obstacles and will be forced to carry their pregnancies to term against their will or may use unsafe methods to attempt to terminate their pregnancies. For example, in June 2019, it was reported that a 12-year-old girl, who had become pregnant as a result of rape, had no option but to continue her pregnancy to term because of the lack of abortion access in Guam.[29]

93.     Since 2018, Plaintiffs have also spoken to multiple individuals who wanted to come to Hawai'i to obtain an abortion, but for whom the financial and logistical obstacles were too difficult to overcome.

94.     Even those who are ultimately able to access care will likely experience delays that subject them to increased risks from both pregnancy *and* the abortion procedure, as well as increased costs. *See infra* ¶¶ 117–21. For example, this past summer, it took several weeks for

---

[28] Even if the abortion falls under one of the exceptions, there is no guarantee that there will be a doctor at a military treatment facility willing and able to perform the abortion.

[29] Jasmine Stole Weiss, *Concern Over Lack of Abortion Provider Raised*, Pac. Daily News (June 3, 2019), https://www.guampdn.com/story/news/local/2019/06/03/concern-over-lack-abortion-provider-raised-guam-news-bwa/1306185001/, attached hereto as Ex. C, Att. 15.

one of Plaintiffs' patients from Guam and her husband to secure funds and make travel arrangements to come to Hawai'i and, by the time they arrived, the patient required a far more expensive procedure than they had initially anticipated, which cost thousands of dollars.

95.    Plaintiffs have also heard from other patients about the challenges they faced traveling to Hawai'i for care, including the challenges of raising sufficient funds, taking time off of work, and trying to keep the reason for their travel secret.

96.    Overall, since mid-2018, Plaintiffs and their colleagues have seen approximately 5–10 abortion patients from Guam. While this is a marked increase as compared to past numbers, it is still a fraction of the overall number of abortions previously provided in Guam during a similar time period. *See supra* ¶ 56.

97.    Since 2018, Plaintiffs have also received multiple requests from people in Guam, asking if they could obtain medication abortion through telemedicine without having to leave the island. As discussed *infra*, due to the challenged statutes, Plaintiffs are unable to provide this service to patients in Guam.

**Background on Abortion, Abortion Safety, and Medication Abortion**

*Background on Abortion*

98.    Abortion is a fundamental component of comprehensive reproductive health care.

99.    In the United States, approximately one in four women will have an abortion by the age of 45.

100.    More than 60% of abortion patients report a religious affiliation: 24% identify as Catholic; 17% as mainline Protestant; 13% as evangelical Protestant; and 8% as another religion.

101.    A majority of women having abortions in the United States already have at least one child.

102. According to the most recent data available, most people in the United States seeking abortions live at or near the federal poverty level.

103. Some patients have abortions because they conclude that it is not the right time to become a parent, or do not want to become a parent at all. Some patients choose abortion to pursue their career or education. Some patients choose abortion because they lack the necessary economic resources or a sufficient level of partner or familial support to care for a child. Many patients plan to have children when they are older, have the necessary financial resources to provide necessities to their children, and/or are in a supportive relationship with a partner.

104. Still others choose abortion because they are already parents and they cannot afford to care for additional children. In some cases, people who are experiencing IPV, struggling with drug addiction, or experiencing homelessness choose abortion because they do not feel they are in the position to care for a child.

105. Other patients choose abortion because continuing with the pregnancy could pose a risk to their health, especially if they have an underlying medical condition that could be complicated by pregnancy, or if they have already experienced a high-risk pregnancy. Other patients terminate wanted pregnancies due to severe or lethal fetal diagnoses.

106. Additionally, as a result of the COVID-19 pandemic and ensuing disruptions in employment, childcare, transportation, and health insurance, some people who would otherwise have chosen to continue a pregnancy may now feel unable to carry to term and give birth.

*Abortion Safety and Impact of Denial of Abortion on Health and Well-Being*

107. Legal abortion, in both the first and second trimester, is one of the safest medical procedures or treatments in the United States.[30]

---

[30] As explained *infra* ¶¶ 127–34, abortions can be accomplished through a procedure performed by a clinician or through medications self-administered by the patient themselves.

108.    A recent, robust analysis of the full spectrum of abortion care in the United States was performed by the National Academies of Sciences, Engineering, and Medicine ("NASEM"), a body composed of experts that was first established by Congress in 1863 to provide independent, objective expert analysis and advice to the nation to inform public policy.

109.    This analysis resulted in a 2018 report, *The Safety and Quality of Abortion Care in the United States*, which concluded that abortion continues to be one of safest medical procedures or treatments provided in the nation.

110.    Complication rates for abortion are extremely low. Serious complications—defined as complications requiring hospitalization, surgery, or blood transfusion—occur in less than one percent of abortion cases. Abortion-related emergency room visits constitute just 0.01% of all emergency room visits by women of reproductive age in the United States.

111.    Abortion is also significantly safer than its only alternative—carrying a pregnancy to term.

112.    The mortality rate for abortion in the United States is approximately 0.44 deaths per 100,000 legal abortions. By contrast, according to data released by the DPHSS, between 2008–2017, the average maternal mortality rate in Guam was approximately 27.0 deaths per 100,000 live births.[31]

113.    A person carrying a pregnancy to term is also far more likely to experience a pregnancy-related complication (morbidity) than a patient who obtains an abortion. Studies show that all common maternal morbidities, including hemorrhage and infection, are far more common among women carrying to term and giving birth than among those having abortions.

---

[31] *See* "Maternal and Child Health Services Title V Block Grant, Guam, FY 2020 Application/FY 2018 Annual Report." *Guam Department of Public Health and Social Services*, 2019, p. 24, 214, https://mchb.tvisdata.hrsa.gov/uploadedfiles/StateSubmittedFiles/2020/GU/GU_TitleV_PrintVersion_FY20.pdf.

114.     Pregnancy also often exacerbates certain existing health conditions, such as high blood pressure (hypertension), diabetes, kidney disease, autoimmune disorders, and asthma. Pregnancy may also induce new medical conditions and complications, such as pregnancy-induced gestational hypertension, venous thrombo-embolism (deep-vein blood clots), iron deficiency anemia, and gestational diabetes.

115.     A person who carries a pregnancy to term also faces all the health risks associated with labor and delivery. Even an uncomplicated delivery is accompanied by serious risks. A vaginal delivery can result in vaginal, cervical, and perineal tears, infection, and injury to the pelvic floor. Furthermore, approximately one-third of pregnancies result in a cesarean section ("C-section") delivery, which is a surgical procedure that carries with it its own set of risks (*i.e.*, hemorrhage, infection and injury to adjacent organs, vessels, or nerves).

116.     The risks associated with pregnancy do not end after delivery; a number of postpartum complications can arise in the minutes, days, weeks, and months after birth. These include retained placenta (when the placenta does not spontaneously deliver after vaginal delivery, potentially resulting in hemorrhage or infection); immediate or delayed postpartum hemorrhage; postpartum hypertension; peripartum cardiomyopathy (a type of heart failure); and postpartum endometritis (a uterine infection that can occur up to six weeks after birth).

117.     While abortion is extremely safe, and safer than continuing the pregnancy to term, the risks from abortion do increase as the pregnancy advances. Moreover, as the number of weeks increases, the abortion procedure becomes more complex and more sedation is required, which bears its own risks.

118.     When patients experience delays in obtaining abortion care, they face both the increased risks associated with pregnancy generally, as detailed above, *and* the increased risks associated with obtaining an abortion later in their pregnancies.

119.    Studies have found that difficulty coming up with funds for travel and to pay for the abortion itself is the most common reason patients seek abortion care later in pregnancy.

120.    When abortion is made more accessible and patients are able to obtain abortion services without unwanted delay, the likelihood of complications decreases, and patient health and well-being is enhanced.

121.    For this reason, the American College of Obstetricians and Gynecologists (ACOG) and other well-respected medical professional organizations have affirmed that abortion is "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[32]

122.    The best available evidence demonstrates that being denied a wanted abortion has significant long-term negative consequences.

123.    For example, research shows that patients who were unable to obtain wanted abortions, and therefore carried their pregnancies to term instead, experienced worse physical health outcomes and increased risk of physical violence from the partner involved in the pregnancy when compared with patients who received desired abortion care.

124.    Research also shows that being denied a wanted abortion resulted in large and persistent negative effects on financial well-being, including lower rates of employment and higher rates of poverty observed in the four years after being denied an abortion.

125.    It is also well-documented the world over that when a patient with an unwanted pregnancy cannot access safe, legal abortion, they may resort to unsafe methods to terminate a pregnancy. *See supra* ¶¶ 51–53.

---

[32] Am. Coll. of Obstetricians & Gynecologists et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak*, ACOG (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

126.    For example, in the Philippines, where abortion has been criminalized for over a century, approximately 1,000 women die annually from unsafe abortion and approximately 100,000 women are admitted to the hospital each year for complications of unsafe abortion.

*Abortion Methods*

127.    There are two primary methods of abortion: medication abortion and procedural abortion. These methods account for approximately 99% of the abortions provided in the United States.

128.    Procedural abortion in the first trimester and early weeks of the second trimester typically involves the use of gentle suction to empty the uterus. This is often referred to as "aspiration abortion." This is the identical procedure that is performed in cases of early miscarriage. After approximately 14–16 weeks of pregnancy, procedural abortions are performed using the dilation and evacuation or "D&E" method, which typically entails same-day or overnight dilation of the cervix and the use of a combination of suction and instruments to remove (or evacuate) the contents of the uterus.

129.    Although aspiration and D&E abortions are sometimes referred to as "surgical" abortion, that is a misnomer, as they do not involve what is typically considered surgery, *i.e.*, an incision into bodily membranes. In accordance with the standards set forth by ACOG, aspiration and D&E abortions are more accurately referred to as "procedures."

130.    In 2000, the U.S. Food and Drug Administration ("FDA") approved a two-drug regimen for medication abortion. The first medication in a medication abortion (mifepristone) works by blocking the body's receptors for the hormone progesterone, which is necessary to maintain the pregnancy. The patient takes the mifepristone, and approximately 24- to 48-hours later, takes the second medication (misoprostol).

131.    Approximately 2- to 24-hours after taking the misoprostol, the patient will experience cramping and bleeding and the passing of small blood clots, just like in an early miscarriage. In fact, the identical medication regimen is offered to miscarriage patients as an alternative to managing the loss of the pregnancy with an aspiration procedure.

132.    The primary difference between a medication abortion and an early miscarriage is that a miscarriage is usually unexpected and does not occur under controlled circumstances. A patient undergoing a medication abortion knows what to expect in advance, chooses when to initiate the process and can ensure that they do so in a safe and appropriate setting.

133.    The FDA generally requires that authorized mifepristone prescribers dispense the medication in person at a medical office, clinic, or hospital (rather than through a pharmacy). However, some physicians—including Plaintiffs—are permitted by the FDA to send mifepristone directly to patients, subject to FDA-approved protocols. *See also infra* ¶¶ 164–70. There are no such limitations on dispensing misoprostol.

134.    Regardless of where they are *dispensed*, both medications are approved by the FDA for self-administration by the patient without direct clinical supervision. Abortion and miscarriage patients typically self-administer the medications at home or in another location of their choosing. Indeed, the bleeding, cramping and passing of small blood clots that occur during a medication abortion are intended to occur—and virtually always do occur—while the patient is at home.

135.    Medication abortion using the mifepristone-misoprostol regimen is generally available up to 10–11 weeks of pregnancy.

136.    As noted above, medication abortion is extremely safe. According to the FDA's clinical review of the current mifepristone-misoprostol regimen, rates of major adverse events,

such as serious infection or hemorrhage requiring transfusion, "are exceedingly rare, generally far below 0.1%."[33]

137.    A small fraction of medication abortion patients may require some form of non-emergency follow-up care. Most often, follow-up care is required because the uterus has retained some tissue (referred to as an "incomplete abortion"), which occurs in approximately 1–5% of cases; or because the patient is still pregnant (referred to as "ongoing pregnancy"), which occurs in approximately 0.8–2.9% of cases. Neither of these is considered a serious adverse event.

138.    "Incomplete abortion" can often be effectively treated without any in-person care. For example, the patient can be offered "expectant management" (advising the patient to "watch and wait" for the retained tissue to pass) or provided with an additional dose of misoprostol, which can be obtained with a prescription at any pharmacy. Alternatively, patients can choose to have an aspiration procedure to remove the retained tissue. These are the same options that are offered to patients experiencing a miscarriage that fails to complete naturally.

139.    In the rare case of an ongoing pregnancy, the patient can also obtain an additional dose of misoprostol or undergo an aspiration procedure.

140.    Since 2000, more than four million people in the United States and millions of people worldwide have used the mifepristone-misoprostol medication abortion regimen to end an early pregnancy.

141.    In fact, as the availability of medication abortion has increased, an increasing number of patients have availed themselves of it as an option. Today, it is estimated that approximately 60 percent of eligible abortion patients in the United States choose medication abortion over the aspiration procedure.

---

[33] FDA Ctr. for Drug Evaluation & Rsch., *Application Number 020687Orig1s020: Medical Reviews* 47 (2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf.

142.     Many people prefer medication abortion because they can complete the process in the privacy of their homes and at a time of their choosing. Others prefer medication abortion because it feels more "natural" to them to have their body expel the pregnancy rather than have instruments inserted into the uterus to empty it.

143.     Some patients choose medication abortion because of fear or discomfort around a procedure involving instruments. For example, victims of rape and people who have experienced sexual abuse or molestation or other trauma may choose medication abortion to feel more in control of the experience and to avoid further trauma from having instruments placed in their vagina.

144.     Some women experiencing IPV, who fear retaliation should they disclose their abortion, choose medication abortion because it presents just like a spontaneous miscarriage.

145.     Some patients have medical conditions that make medication abortion a significantly safer option, with a lower risk of both complications and failure than procedural abortion. These conditions include anomalies of the reproductive and genital tract, such as large uterine fibroids, female genital mutilation, vaginismus, or cervical stenosis, as well as severe obesity or an extremely flexed uterus, all of which can make it difficult to access the pregnancy inside the uterus as part of a procedural abortion.

146.     As discussed *infra* ¶¶ 155–63, medication abortion is routinely provided to patients in a variety of settings, including by telemedicine.

**Telemedicine**

147.     Telemedicine, the use of electronic information and telecommunications technologies to support the delivery of health care services remotely, is used around the United States and internationally to provide health care services across many disciplines and in a variety of settings.

148.    There are a variety of telemedicine patient care models, including live video-conferencing, also known as synchronous video. This involves a live, two-way interaction between a patient and health care provider using audiovisual technology. In live video-conferencing, the provider is usually located in a clinical setting, and the patient may be located at a remote health care facility or in a non-clinical setting, *e.g.*, in their home.

149.    When the patient is located in a non-clinical setting, this is sometimes referred to as direct-to-patient telemedicine. Direct-to-patient telemedicine often utilizes live video-conferencing and is frequently used for services such as medication management, the diagnosis and treatment of primary or urgent care concerns, and psychiatry and psychotherapy visits.

150.    For all forms of telemedicine, providers use their clinical judgment to determine whether a patient can be safely evaluated and treated remotely without an in-person visit based on the particular patient's circumstances.

151.    However, the use of telemedicine does not preclude the reliance on certain in-person testing, *i.e.*, ultrasounds or blood tests. As is common in all areas of medicine, such tests can be obtained locally and then forwarded to the treating provider to be reviewed and assessed prior to diagnosing or treating the patient.

152.    Patient education and informed consent conversations occur over live video-conference just as they do in person: the provider shares the same information they would during an in-person visit, and patients are given the opportunity to ask questions and receive answers in real time.

153.    While the use of telemedicine has been steadily increasing across medical disciplines as its benefits become more widely known, the COVID-19 pandemic has accelerated an increase in its use. This is because telemedicine provides an ideal means to ensure patients can

continue to access not only time-sensitive care, but also comprehensive and preventive care, while eliminating unnecessary in-person interactions for both patients and clinicians.

154. For example, in March 2020, Guam Regional Medical City ("GRMC") announced that it was introducing a direct-to-patient telehealth program to "reduce the need for physical contact while continuing to provide excellent health care during the COVID-19 emergency," noting "[t]he program was originally introduced at GRMC to make doctor visits easier for patients with mobility issues, transportation problems, etc. and will continue to be used for that purpose after the COVID-19 crisis."[34] One neurologist at GRMC, describing how he conducts video appointments with patients, further explained that telehealth "might be the way of the future for GRMC."[35]

*Telemedicine Medication Abortion*

155. The availability of medication abortion care using telemedicine has proven incredibly important for patient access to essential reproductive health care in the United States and abroad.

156. Over the past decade, medication abortion has been provided in many U.S. states using telemedicine, including Alaska, Colorado, Georgia, Hawai'i, Illinois, Iowa, Maine, Maryland, Minnesota, Montana, New Mexico, New York, Oregon, and Washington, as well as the District of Columbia.

157. The availability of telemedicine for abortion care expands services to those who have difficulty accessing them—*e.g.*, because they live in an area with few or no abortion providers—thereby minimizing delays in accessing care and enhancing patient health and safety,

---

[34] *GRMC Introduces Telehealth*, Guam Reg'l Med. City (Mar. 25, 2020), https://www.grmc.gu/2020/03/26/grmc-introduces-telehealth/, attached hereto as Ex. C, Att. 16.

[35] Mai Habib, *GRMC's Telehealth Now an Option in Wake of Social Distancing*, Pac. News Ctr. (Mar. 30, 2020), https://www.pncguam.com/grmcs-telehealth-now-an-option-in-wake-of-social-distancing/, attached hereto as Ex. C, Att. 17.

*see supra* ¶¶ 117–21, and enabling people to obtain care in their own communities that might otherwise be unavailable.

158.    Moreover, even when abortion care is available locally, evidence and Plaintiffs' own experiences demonstrate that some patients prefer using telemedicine because of the increased flexibility and privacy.

159.    There is an extensive body of literature demonstrating the safety and efficacy of providing medication abortion using telemedicine. Indeed, the NASEM has determined that "[t]here is no evidence that the dispensing or taking of [medication abortion pills] requires the physical presence of a clinician."[36] ACOG has likewise concluded that "medication abortion can be provided safely and effectively by telemedicine with a high level of patient satisfaction" and "medication abortion through telemedicine [is]… equally effective as an in-person visit" with no difference in adverse events.[37]

160.    For example, in a 2011 study in Iowa, researchers examining the safety and efficacy of telemedicine medication abortion found that the success rate for telemedicine patients receiving medication abortion (98.7%) was comparable to the success rate for in-person patients (96.9%), with no significant difference between telemedicine and in-person patients' occurrence of adverse events. Further, patients reported a high level of satisfaction with telemedicine care.

161.    In a 2017 study, also in Iowa, researchers compared patients who received care by telemedicine (8,765 patients) with those who received care in person (10,405) over a seven-year period. Among medication abortion patients generally, clinically significant adverse events were

---

[36] Nat'l Acads. of Sci., Eng'g & Med., *The Safety and Quality of Abortion Care in the United States* 79 (2018).

[37] Am. Coll. of Obstetricians & Gynecologists Comm. on Practice Bulletins—Gynecology & the Society of Family Planning, *Medication Abortion Up to 70 Days of Gestation*, 102 Contraception 225, 228 (2020).

rare (0.26%), and among telemedicine patients specifically, they occurred only 0.18% of the time, compared to 0.32% for in-person patients.

162.    And, in 2019, an international team of researchers for the World Health Organization conducted a systematic review of evidence concerning telemedicine used for medication abortion and found that it is safe, effective, and well-liked by both patients and providers.

163.    There is also research focusing specifically on the use of telemedicine to obtain informed consent for abortion, which shows that telemedicine is highly acceptable to patients as a mode of attending state-mandated abortion information visits and helps reduce the travel and logistical burdens of attending the information visit in person.

**Plaintiffs' Telemedicine Abortion Practice**

164.    Since 2016, Plaintiffs have used a direct-to-patient telemedicine model to counsel and prescribe medication abortion to hundreds of eligible patients in Hawai'i, the majority of whom lived on islands where there were no abortion providers.

165.    As noted above, subject to compliance with certain FDA-approved protocols, Plaintiffs can send both medications used for a medication abortion directly to eligible patients, instead of requiring the patient to pick up the first medication used in a medication abortion—mifepristone—in person.

166.    This means Plaintiffs can use telemedicine to consult with the patient and obtain informed consent, while the patient is in a location of their choosing, and then send the medications directly to patients. *See infra* ¶¶ 175–89.[38]

---

[38] While the patient has the ability to choose the location where they attend the telemedicine appointment and receive the medications, they must be located in Hawai'i; Plaintiffs do not provide care to patients located in jurisdictions where they are not licensed to practice medicine.

167.     Similar telemedicine programs have served eligible patients in Colorado, Georgia, Illinois, Iowa, Maine, Maryland, Minnesota, Montana, New Mexico, New York, Oregon, Washington, and the District of Columbia, and other states, where permitted by law.

168.     These programs are part of the TelAbortion Project. The TelAbortion Project provides updates on the program to the FDA, which has approved the program's continued use, subject to compliance with FDA-approved protocols.

169.     Each one of Plaintiffs' patients who utilizes this service (TelAbortion) is informed that the medications are the same as what they would get if they came to the office for a medication abortion, but that the process differs in three main ways:

     a.  The initial and follow-up consultations with the abortion provider will be conducted via telemedicine instead of in person;

     b.  Any necessary exams, ultrasounds, and lab tests will be performed at medical facilities near the patient rather than at the abortion provider's office; and

     c.  The medications will be delivered by mail rather than handed to the patient in person.

170.     Each TelAbortion patient provides specific consent to these protocols, as well as to the sharing of certain health information with the FDA.

171.     As of December 2020, approximately 80% of Plaintiffs' TelAbortion patients have lived on those Hawaiian Islands where local access to abortion is either limited or non-existent.

172.     This service has enabled these patients to access the care they need without unnecessary delay; without having to fly hundreds of miles and potentially staying overnight at a hotel to obtain care; and without incurring travel costs, childcare costs, lost wages and/or jeopardizing their ability to keep their abortion decision confidential.

173.     As of December 2020, the other approximately 20% of Plaintiffs' TelAbortion patients lived on O'ahu, where there is regular access to in-clinic medication and procedural abortions. These patients nevertheless opted to use the service because of the privacy and flexibility it provides.

174.     Since the onset of the pandemic, Plaintiffs have seen a dramatic increase in the number of patients seeking to obtain a medication abortion by telemedicine, including on O'ahu.

175.     All of Plaintiffs' patients who are interested in obtaining a medication abortion through telemedicine undergo an initial screening by telephone.

176.     If the patient is preliminarily eligible and interested in proceeding, the patient will be scheduled for a video appointment—using a secure Internet-based platform—with a physician. The patient is provided with information and forms to review prior to the appointment, including instructions on any lab work, ultrasound, or other testing ("pre-abortion testing") that may be necessary.

177.     Because of the flexibility afforded by this model, patient appointments can be scheduled outside of regular clinic hours to accommodate those patients who may, *e.g.*, have difficulty getting time off from work during the day.

178.     Any pre-abortion testing that may be required can be obtained from any OB-GYN, family medicine, or other general medical office, as well as radiology offices and laboratories. Because the pre-abortion testing are all routine tests relating to the confirmation and care of an ongoing pregnancy, patients do not need to disclose they intend to have an abortion to obtain them. Patients can ask that test results be sent directly to Plaintiffs or can send them themselves electronically or by fax.

179.     During the video appointment, Plaintiffs assess eligibility for medication abortion the same way they would if the patient was at the clinic, *e.g.*, by taking the patient's medical

history and reviewing any pre-abortion testing. Plaintiffs will not prescribe, dispense, or mail the medication abortion unless and until they have been able to review any necessary test results.

180.     During the video appointment, Plaintiffs also explain the medication abortion process, again providing all the same information and counseling they would provide to a patient who came to the clinic in person for a medication abortion—*e.g.*, how to take the medications, what to expect when they take the medications, potential side effects and complications. In particular, Plaintiffs explain what symptoms and side effects are normal, and when to seek additional or emergency medical attention.

181.     Finally, just as with patients obtaining a medication abortion in person, Plaintiffs review the required consent forms, answer any questions, and take any other necessary steps to ensure that the patient's consent is informed and voluntary. If an eligible patient wishes to proceed with the abortion, Plaintiffs instruct them how to sign the required consent forms electronically.

182.     In Plaintiffs' experience, the vast majority of patients are certain of their abortion decision by the time of their video appointment. For those who are uncertain, Plaintiffs answer their questions and provide nondirective counseling to enable them to make the decision that is best for them and their circumstances, including deciding not to have an abortion. This is the same process Plaintiffs follow for in-clinic patients expressing ambivalence about their decision.

183.     Once the patient's eligibility is confirmed and consent forms are signed, Plaintiffs either mail the patient the medications or the patient can pick up the medications from Plaintiffs' offices in person. The total out-of-pocket cost to telemedicine patients, for the video appointment and follow-up appointments and the medications, is approximately $240.

184.     Plaintiffs provide all patients—whether they obtain care by telemedicine or in person—with a phone number staffed 24-hours a day/7-days a week, if they have any questions or concerns at any time during the process.

185.    In addition, Plaintiffs ask all patients—whether they obtain care by telemedicine or in person—for the date they intend to start the medication abortion process and two follow-up appointments (telephone) are scheduled: one for seven days after and one for four weeks after they initiated the process. Patients are provided with and instructed to take a urine pregnancy test four weeks after they started the medication abortion. Patients are advised that they may also obtain an ultrasound or blood test to confirm the abortion was successful.

186.    The purpose of the first follow-up appointment is to do an initial assessment of whether the abortion was successful, *e.g.*, to discuss the amount of bleeding, and whether the patient is experiencing any symptoms that might require follow-up care, *e.g.,* symptoms of ongoing pregnancy or incomplete abortion. At the second, four-week follow-up appointment, Plaintiffs review the results of the urine pregnancy test or any other tests the patient might have obtained to confirm the abortion was successful. At this time, Plaintiffs also discuss whether there were any previously unreported complications or unscheduled medical visits after the medication abortion and ask about patients' satisfaction with the overall process.

187.    As noted above, it is routine for all medication abortion patients—regardless of where they live or whether they obtained the medications through telemedicine and/or the mail— to be scheduled for follow-up appointments by telephone. Medical guidelines issued by ACOG and the Society for Family Planning confirm that follow-up can be performed by telephone to avoid the need for a patient to travel to a clinical facility.

188.    In Plaintiffs' experience, patient satisfaction with medication abortion using telemedicine is extremely high both because of the privacy and flexibility it affords. Some patients have stated that, if it were not for telemedicine, they would not have been able to obtain an abortion at all.

189.     Moreover, Plaintiffs' telemedicine patients often appear more comfortable and at ease than patients who obtain medication abortion through an in-person visit. This is likely because telemedicine patients have more flexibility and control over the time and setting of their video appointment, which reduces stress, and also because it is much easier to include partners, family members, or other support people in the process, if that is their preference.

**Plaintiffs' Ability to Provide Abortions in Guam and the Challenged Statutes**

190.     Plaintiffs' telemedicine practice, described *supra*, could easily be adapted to serve patients in Guam, the same way it already serves patients on Hawaiian Islands located hundreds of miles from an abortion provider.

191.     Expanding telemedicine medication abortion to Guam would benefit public health because, as set forth *supra* ¶¶ 107–26, a lack of abortion access is detrimental to public health. It would be particularly beneficial during the current pandemic, because it would enable people to access the health care they need while reducing unnecessary travel and in-person interactions, thereby reducing the risk of exposure and transmission of the COVID-19 virus.

192.     Moreover, because most abortions are already sought in the first trimester when medication abortion is available, offering medication abortion using telemedicine is well-suited to meet the existing need. In turn, this would likely reduce the number of patients seeking abortions later in pregnancy, when risks are increased, because patients would no longer need to take the time to save thousands of dollars in health care and travel costs to obtain an abortion in Hawai'i.

193.     However, the challenged statutes, 9 G.C.A. § 31.20 and 10 G.C.A. § 3218.1, currently prevent Plaintiffs from providing patients in Guam access to medication abortion in the following respects.

194.  **First**, the Clinic Requirement states that the "termination of a human pregnancy" is a third-degree felony unless, *inter alia*, it is "performed" by a physician in a clinical setting. 9 G.C.A. §§ 31.20(b)(2), 31.21.

195.  The term "performed," as used in the Clinic Requirement, is not defined.

196.  While Plaintiffs' obligations under the Clinic Requirement are clear in the context of abortion procedures, Plaintiffs do not know how to comply with this requirement in the context of medication abortion.

197.  Unlike in a procedural abortion, where a clinician evacuates the uterus thereby terminating the pregnancy, a clinician providing medication abortion does not "perform" any medical procedure on the patient to terminate the pregnancy; rather, they simply *prescribe* two medications to the patient, which the patient self-administers 24–48 hours apart to induce the miscarriage-like process. *See supra* ¶¶ 130–34.

198.  Plaintiffs have no way of knowing how the Attorney General, GBME, and/or the Commission—those charged with enforcing the Clinic Requirement and medical licensure requirements—would interpret "performed" in the context of medication abortion, or whether they would uniformly and consistently adopt the same interpretation.

199.  For example, the term "performed" could be construed solely to refer to the act of prescribing a medication abortion. Alternatively, it could also refer to the act of physically providing the pills to the patient.

200.  Moreover, unlike in a procedural abortion, a patient obtaining a medication abortion does not pass the pregnancy in a clinical setting; rather, the pregnancy passes while the patient is at home (or in an alternative location of their choosing). *See supra* ¶¶ 130–34.

201. Thus, unlike in a procedural abortion, with a medication abortion the relative location of the clinician and patient at the time the medications are prescribed and/or ingested is medically irrelevant. *See supra* ¶¶ 130–34.

202. While Plaintiffs may be located in a clinical setting when they use telemedicine to prescribe medication abortion, their patients are not. *See supra* ¶¶ 164–69.

203. Plaintiffs have no way of knowing how the Attorney General, GBME, and/or the Commission—those charged with enforcing the Clinic Requirement and medical licensure requirements—would interpret the specific clinical setting requirement in the context of medication abortion, or whether they would uniformly and consistently adopt the same interpretation.

204. For example, the Clinic Requirement could be construed not to apply to medication abortion because it does not make sense in that context, or it could be construed to require solely that the physician (not the patient) be located in a clinical setting when they prescribe a medication abortion. Alternatively, it could be construed to require the patient and physician to be in the same physical location when the medications are provided to the patient, which would prohibit Plaintiffs from using telemedicine to provide medication abortion to eligible patients in Guam.

205. The Clinic Requirement is thus subject to multiple, differing interpretations in the context of medication abortion.

206. The Clinic Requirement thus contains no standards to guide those charged with its enforcement in the context of medication abortion.

207. Because Plaintiffs do not know how those charged with enforcement will interpret and enforce the terms of the Clinic Requirement—or whether they will adopt uniform and

consistent interpretations of its terms—Plaintiffs will not risk criminal, civil, and/or licensing penalties by using telemedicine to provide medication abortion to patients in Guam.

208. **Second**, by requiring the state-mandated information be provided "in person," 10 G.C.A. § 3218.1 prohibits Plaintiffs from using live video-conference telemedicine to comply with its terms. Even if Plaintiffs delegated the responsibility of conveying this information in person to other qualified providers in Guam, *see* 10 G.C.A.§§ 3218.1(a)(13), (b)(1), forcing patients to make a separate trip to a separate health care provider solely to obtain this information would impose unnecessary logistical and financial obstacles and would expose patients to unjustified risks during a pandemic.

209. Moreover, by requiring the state-mandated information be provided to patients "individually" and "in a private room," 10 G.C.A. § 3218.1(b)(4) also appears to limit Plaintiffs' patients' ability to utilize telemedicine to obtain informed consent for abortion in a safe and supportive setting by, *e.g.*, precluding patients from including their partners, family members, or other trusted individuals in the process.

210. Because of these statutory barriers, absent intervention from this Court, Plaintiffs cannot provide patients in Guam with medication abortion using telemedicine.

211. Because of these statutory barriers, absent intervention from this Court, Guam-based patients cannot obtain medication abortion using telemedicine.

212. On information and belief, because of these statutory barriers, absent intervention from this Court, there is no known means of obtaining a legal abortion in Guam.

213. Further, because of these statutory barriers, even if the Clinic Requirement did not bar Plaintiffs from providing medication abortion using telemedicine, absent intervention from this Court, Plaintiffs' telemedicine patients will still be forced to obtain the state-mandated information from separate health care providers in Guam, which will subject them to unnecessary

and unjustified burdens and risks to their health. Likewise, because of these statutory barriers, absent intervention from this Court, Plaintiffs' telemedicine patients would be prevented from using telemedicine in the safe and supportive setting of their choosing.

214.    Guam law does not prohibit Guam-licensed physicians or Guam-based patients from using telemedicine to provide or obtain treatment in any other context except abortion, which is constitutionally protected medical care.

215.    Guam law does not prohibit Guam-licensed physicians or Guam-based patients from using telemedicine to obtain or provide informed consent for any other medical treatment or procedure except abortion, which is constitutionally protected medical care.

216.    Guam law does not force any other Guam-based patient, except those seeking an abortion (which is constitutionally protected medical care) to exclude their partner, family members, or other trusted individuals from the informed consent process, or otherwise limit the setting in which a patient can provide informed consent using telemedicine.

## CLAIMS FOR RELIEF

### COUNT 1

### (Fourteenth Amendment-Vagueness-Due Process)

### 9 G.C.A. § 31.20

217.    The allegations in paragraphs 1 through 216 are incorporated as though fully set forth herein.

218.    By failing to provide adequate notice as to how to comply with its terms in the context of medication abortion and/or failing to provide explicit standards to govern the enforcement of its terms in the context of medication abortion, 9 G.C.A. § 31.20(b)(2) is unconstitutionally vague and violates Plaintiffs' rights to due process of law.

**COUNT 2**

**(Fourteenth Amendment-Substantive Due Process)**

**9 G.C.A. § 31.20**

219.    The allegations in paragraphs 1 through 216 are incorporated as though fully set forth herein.

220.    To the extent it operates as a ban on pre-viability abortion in Guam, 9 G.C.A. § 31.20(b)(2) violates the rights of people seeking pre-viability abortion in Guam to privacy and liberty, as guaranteed by the Fourteenth Amendment.

221.    In the alternative, to the extent it prohibits the use of telemedicine for medication abortion, 9 G.C.A § 31.20(b)(2), imposes an undue burden on people seeking pre-viability abortion in Guam and violates their rights to privacy and liberty as guaranteed by the Fourteenth Amendment.

**10 G.C.A. § 3218.1**

222.    The allegations in paragraphs 1 through 216 are incorporated as though fully set forth herein.

223.    To the extent it forces Plaintiffs' patients in Guam to obtain the state-mandated information *in person*, as opposed to through telemedicine, 10 G.C.A. § 3218.1 imposes an undue burden on these patients and violates their rights to privacy and liberty as guaranteed by the Fourteenth Amendment.

224.    To the extent it prohibits Plaintiffs' patients from including a support person in the informed consent process, and otherwise obtaining the state-mandated information in a safe and supportive setting of their choosing, 10 G.C.A. § 3218.1 imposes an undue burden on these patients and violates their rights to privacy and liberty as guaranteed by the Fourteenth Amendment.

**COUNT 3**

**(Fourteenth Amendment-Equal Protection/Substantive Due Process)**

**9 G.C.A. § 31.20**

225.     The allegations in paragraphs 1 through 216 are incorporated as though fully set forth herein.

226.     To the extent it prohibits the use of telemedicine to provide medication abortion, 9 G.C.A. § 31.20(b)(2) violates Plaintiffs' and their patients' rights to due process and equal protection as guaranteed by the Fourteenth Amendment by singling out and treating providers of telemedicine medication abortion and their patients differently than any other telemedicine providers or patients without any rational basis.

**10 G.C.A. § 3218.1**

227.     The allegations in paragraphs 1 through 216 are incorporated as though fully set forth herein.

228.     To the extent it prohibits the use of telemedicine to obtain informed consent for medication abortion, 10 G.C.A. § 3218.1 violates Plaintiffs' and their patients' rights to due process and equal protection as guaranteed by the Fourteenth Amendment by singling out and treating providers of telemedicine medication abortion and their patients differently than any other telemedicine providers or patients without any rational basis.

229.     To the extent it restricts the ability of telemedicine medication abortion patients to obtain state-mandated information prior to an abortion in a safe and supportive setting of their choosing, 10 G.C.A. § 3218.1 violates Plaintiffs' patients' rights to due process and equal protection as guaranteed by the Fourteenth Amendment by singling out and treating telemedicine medication abortion patients differently than any other telemedicine patients without any rational basis.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs ask for the following relief:

230.    To issue a preliminary and permanent injunction restraining Defendants (along with their successors in office, officers, agents, servants, employees, attorneys and anyone acting in concert or participation with them) from enforcing 9 G.C.A. § 31.20 and 10 G.C.A. § 3218.1 to prohibit or otherwise restrict, in the manner set forth above, the use of telemedicine to provide medication abortion to eligible patients in Guam.

231.    To enter a judgment, pursuant to 28 U.S.C. § 2201, declaring 9 G.C.A. § 31.20 and 10 G.C.A. § 3218.1 unconstitutional as applied to prohibit or otherwise restrict, in the manner set forth above, the use of telemedicine to provide medication abortion to eligible patients in Guam.

232.    To award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

233.    To grant such other and further relief as the Court deems just and proper.


Respectfully submitted this 28th day of Janauary, 2021.

LAW OFFICE OF VANESSA L. WILLIAMS, P.C.
*Attorney for Plaintiffs Bliss Kaneshiro, M.D.,*
*M.P.H. and Shandhini Raidoo, M.D., M.P.H.*

_____
VANESSA L. WILLIAMS, ESQ.