VANESSA L. WILLIAMS, ESQ.
LAW OFFICE OF VANESSA L. WILLIAMS, P.C.
414 WEST SOLEDAD AVENUE
GCIC BLDG., SUITE 500
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-1389
EMAIL: vlw@vlwilliamslaw.com

ALEXA KOLBI-MOLINAS*
MEAGAN BURROWS*
RACHEL REEVES*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 BROAD STREET, 18TH FLOOR
NEW YORK, NY 10004
TEL: (212) 549-2633
EMAIL: akolbi-molinas@aclu.org

* Application for admission pro hac vice pending

Attorneys for Plaintiffs

**IN THE DISTRICT COURT OF GUAM**

| | |
|---|---|
| SHANDHINI RAIDOO, *et al.*, | ) |
| | ) CIVIL CASE NO. 21-00009 |
| Plaintiffs, | ) |
| | ) |
| vs. | ) **MEMORANDUM IN SUPPORT OF** |
| | ) **PLAINTIFFS' MOTION FOR A** |
| LEEVIN TAITANO CAMACHO, *et al.*, | ) **PRELIMINARY INJUNCTION** |
| | ) |
| Defendants. | ) |
| | ) |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ....................................................................................................... 1

   I.  STATUTORY BACKGROUND................................................................... 2

   II.  FACTS ............................................................................................................ 4

       A.  Background on Abortion Safety and Access ................................. 4

       B.  Medication Abortion and Telemedicine ....................................... 7

       C.  Abortion Access in Guam.............................................................. 12

       D.  Telemedicine Abortion in Guam ................................................... 14

ARGUMENT ............................................................................................................. 16

   I.  Plaintiffs Are Likely to Succeed on Their Claim That the Clinic Requirement Is Unconstitutionally Vague as Applied to Medication Abortion. ...................................... 16

   II.  Plaintiffs Are Likely to Succeed on Their Claim That the Clinic Requirement and State-Mandated Information Law Violate Plaintiffs' Patients' Rights to Substantive Due Process............................................................................................ 21

       A.  *Clinic Requirement* ..................................................................... 25

       B.  *State-Mandated Information Law* ............................................... 27

   III. Plaintiffs and Their Patients Will Suffer Irreparable Harm Absent Injunctive Relief...... 32

   IV. The Balance of Equities Strongly Favors Plaintiffs and the Public Interest Is Served by An Injunction. ......................................................... 33

CONCLUSION.......................................................................................................... 34

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ................................................................. 16

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ........................................................... 32, 33

*Cardenas v. United States*,
   826 F.3d 1164 (9th Cir. 2016) ................................................................. 23

*Doe v. Bolton*,
   410 U.S. 179 (1973) ................................................................................. 22

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................................................. 32

*EMW Women's Surgical Ctr., P.S.C. v. Friedlander*,
   978 F.3d 418 (6th Cir. 2020) ................................................................... 23

*Farris v. Seabrook*,
   677 F.3d 858 (9th Cir. 2012) ................................................................... 16

*Forbes v. Napolitano*,
   236 F.3d 1009 (9th Cir. 2000) ........................................................... 17, 20

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ................................................................................. 17

*Guam Soc'y of Obstetricians & Gynecologists v. Ada*,
   962 F.2d 1366 (9th Cir. 1992) ................................................................. 21

*Harris v. Bd. of Supervisors*,
   366 F.3d 754 (9th Cir. 2004) ................................................................... 33

*Hopkins v. Jegley,*
   968 F.3d 912 (8th Cir. 2020) ........................................................................ 23

*Isaacson v. Horne,*
   716 F.3d 1213 (9th Cir. 2013) ................................................................. 21, 25

*Jackson Women's Health Org. v. Currier,*
   760 F.3d 448 (5th Cir. 2014) ....................................................................... 26

*Jackson Women's Health Org. v. Dobbs,*
   945 F.3d 265 (5th Cir. 2019) ....................................................................... 22

*June Medical Servs., LLC v. Russo,*
   140 S. Ct. 2103 (2020) ............................................................ 22, 23, 25, 26

*Kallstrom v. City of Columbus,*
   136 F.3d 1055 (6th Cir. 1998) ..................................................................... 33

*Karlin v. Foust,*
   188 F.3d 446 (7th Cir. 1999) ....................................................................... 27

*Little Rock Fam. Plan. Servs. v. Rutledge,*
   398 F. Supp. 3d 330 (E.D. Ark. 2019) ......................................................... 22

*McCormack v. Herzog,*
   788 F.3d 1017 (9th Cir. 2015) ............................................................... 17, 20

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) ................................................................. 32, 34

*Missouri ex rel. Gaines v. Canada,*
   305 U.S. 337 (1938) .................................................................................... 25

*Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville,*
   896 F.2d 1283 (11th Cir. 1990) ................................................................... 32

*Nelson v. Nat'l Aeronautics & Space Admin.*,

    530 F.3d 865 (9th Cir. 2008) ........................................................................ 32

*Planned Parenthood Ariz., Inc. v. Humble*,

    753 F.3d 905 (9th Cir. 2014) ................................................................... passim

*Planned Parenthood Minn., N.D., S.D. v. Daugaard*,

    799 F. Supp. 2d 1048 (D.S.D. 2011) ............................................................ 29

*Planned Parenthood of Cent. & N. Ariz. v. Arizona*,

    718 F.2d 938 (9th Cir.1983) ........................................................................ 19

*Planned Parenthood of Se. Pa. v. Casey*,

    505 U.S. 833 (1992) ............................................................................... passim

*Planned Parenthood of Wis., Inc. v. Schimel*,

    806 F.3d 908 (7th Cir. 2015) ........................................................................ 25

*Planned Parenthood Se., Inc. v. Bentley*,

    951 F. Supp. 2d 1280 (M.D. Ala. 2013) ....................................................... 33

*Planned Parenthood Se., Inc. v. Strange*,

    9 F. Supp. 3d 1272 (M.D. Ala. 2014) ........................................................... 29

*Planned Parenthood Se., Inc. v. Strange*,

    33 F. Supp. 3d 1330 (M.D. Ala. 2014)………………………………………... 29

*Rodriguez v. Robbins*,

    715 F.3d 1127 (9th Cir. 2013) ...................................................................... 33

*Roe v. Wade*,

    410 U.S. 113 (1973) ..................................................................................... 21

*Steffel v. Thompson*,

    415 U.S. 452 (1974) ..................................................................................... 20

*Stenberg v. Carhart,*

    530 U.S. 914 (2000) ................................................................................. 25

*Summit Med. Ctr. of Ala., Inc. v. Siegelman,*

    227 F. Supp. 2d 1194 (M.D. Ala. 2002) ................................................... 27

*Tucson Woman's Clinic v. Eden,*

    379 F.3d 531 (9th Cir. 2004) .......................................... 17, 19, 20, 27

*United Food & Com. Workers Loc. 99 v. Bennett,*

    934 F. Supp. 2d 1167 (D. Ariz. 2013) ..................................................... 21

*United States v. Epps,*

    707 F.3d 337 (D.C. Cir. 2013) ................................................................. 23

*Valle del Sol Inc. v. Whiting,*

    732 F.3d 1006 (9th Cir. 2013) ................................................................. 32

*W. Ala. Women's Ctr. v. Williamson,*

    120 F. Supp. 3d 1296 (M.D. Ala. 2015) .................................................. 30

*Whole Woman's Health v. Hellerstedt,*

    136 S. Ct. 2292 (2016) .................................................... 22, 23, 26, 28

*Winter v. Nat. Res. Def. Council, Inc.,*

    555 U.S. 7 (2008) ....................................................................................... 16

**Statutes**

10 G.C.A. § 12209 ............................................................................................. 3

10 G.C.A. § 3218.1 ................................................................................... passim

9 G.C.A. § 31.20 .................................................................... 2, 13, 15, 18

9 G.C.A. § 31.21 ............................................................................................... 3

**Other Authorities**

Guam Att'y Gen. Op. No. 17-0351 (Nov. 6, 2017).........................................................................3

Letter from Eddie Baza Calvo, Gov. of Guam, to Judith Won Pat, Speaker of the Guam

  Legislature (Nov. 6, 2012)…………………………………………………………………...31

# INTRODUCTION

For more than four decades, Guamanians have fought to ensure and maintain access to safe and legal abortion on the island. However, because the challenged laws prevent Plaintiffs from providing pre-viability abortion care to patients in Guam, there are no known providers of legal abortion in Guam. Guamanians who seek to exercise their constitutional right to abortion are currently being forced to travel nearly 4,000 miles *each way* to Hawai'i, or even farther, to obtain a legal abortion. This imposes significant and, for many, insurmountable burdens on Guamanians and their families. Indeed, Plaintiffs have had multiple, heartbreaking conversations with individuals in Guam seeking abortions who are unable to make the journey to Hawai'i and must either carry their pregnancies to term against their will or seek care outside the medical system. Even for those who are able to make the journey, being forced to travel elsewhere in the United States in order to exercise one's constitutional rights imposes an additional, dignitary harm on Guamanians—raising questions of the meaning of citizenship, equality, national identity, and difference—that only compounds the ongoing injury caused by the lack of abortion access on the island. That Guam, like the rest of the world, is also in the midst of a global pandemic that makes travel, at best, difficult and dangerous—and, at worst, impossible—renders the situation simply intolerable.

Plaintiffs are two OB/GYNs with nearly three decades of combined experience providing comprehensive reproductive health care, including abortion, licensed to practice medicine in both Hawai'i and Guam. Since 2016, Plaintiffs, who are located in O'ahu, have been providing medication abortion care using telemedicine to eligible patients throughout Hawai'i, the majority of whom lived on islands where there are no abortion providers, and who would otherwise have to fly hundreds of miles to obtain care. But for the challenged laws, Plaintiffs would be able to

offer this service to eligible patients in Guam and thereby restore access to abortion to those on the island.

For the reasons set forth below, and under clear Supreme Court and Ninth Circuit precedent, by preventing Plaintiffs from providing medication abortion using telemedicine, the challenged laws effectively and unconstitutionally prohibit pre-viability abortion in Guam today. Even to the extent the challenged laws do not eliminate access to legal abortion outright, they create burdensome and medically unnecessary requirements that impose an unconstitutional undue burden on patients seeking pre-viability abortion—again in violation of clear Supreme Court and Ninth Circuit precedent. As such, the challenged laws are currently inflicting and will continue to inflict irreparable harm on those seeking abortions in Guam, and the balance of equities and public interest weigh heavily in favor of injunctive relief.

## I. STATUTORY BACKGROUND

Guam law mandates that all abortions "be performed" by an appropriately licensed physician "in the physician's adequately equipped medical clinic or in a hospital approved or operated by the United States or [Guam]." 9 G.C.A. § 31.20(b)(2) (the "Clinic Requirement" or "Section 31.20").[1] This requirement was enacted in 1978 as part of the statute that de-criminalized abortion in Guam. Decl. of Michael Lujan Bevacqua, Ph.D., attached hereto as Ex. 1, ¶ 24. For purposes of this statute, "abortion" is defined to mean "the termination of a human pregnancy with an intention other than to produce a live birth or to remove a dead fetus." 9 G.C.A. § 31.20(a). The Clinic Requirement, which was enacted before medication abortion was available, does not differentiate between (i) procedural abortions, which are medical procedures typically performed by a health care provider in a clinical setting, and (ii) medication abortions. Medication abortions are not procedures at all, but two medications self-administered by the patient, over a period of

---

[1] Additional laws regulating abortion, which are not challenged in this lawsuit, including extensive reporting requirements, are set forth in ¶¶ 19–33 of the Complaint.

24–48 hours, that induce what is essentially a miscarriage while the patient is outside the clinical setting (usually at home). *See infra* pp. 7–8. Failure to comply with the Clinic Requirement is a third-degree felony, *see* 9 G.C.A. § 31.21, and could also lead to professional disciplinary action (including loss of medical license), *see, e.g.*, 10 G.C.A. § 12209(d)(3).

Guam law also requires that the abortion provider or another "qualified person" provide a patient certain mandated information *in person* at least 24 hours prior to an abortion, except in medical emergencies. 10 G.C.A. §§ 3218.1(b)(1), (b)(2) (the "State-Mandated Information Law" or "Section 3218.1"). Abortion for purposes of this statute is defined to include, *inter alia*, "the use or prescription of any instrument, medicine, drug, or other substance or device to terminate the pregnancy of a woman known to be pregnant with an intention other than to increase the probability of a live birth." *Id.* at (a)(1). This information must also be delivered to the patient "individually" and "in a private room." *Id.* at (b)(4). Failure to comply with the State-Mandated Information Law is a misdemeanor and could also result in professional disciplinary action (including loss of medical license), and other civil and administrative penalties. *Id.* at (f)–(g); *see also* 10 G.C.A. § 12209(d)(3).

Guam law permits the use of telemedicine by Guam-licensed physicians to provide medical treatment or obtain informed consent. *See generally* Guam Att'y Gen. Op. No. 17-0351 (Nov. 6, 2017). Although Guam law does not contain any *explicit* restrictions on the use of telemedicine in the context of abortion, as explained further below, the ambiguous and outdated language of the Clinic Requirement as applied to medication abortion, along with the State-Mandated Information Law's in-person requirement, effectively prohibit Plaintiffs from using telemedicine to counsel and provide medication abortion to eligible patients in Guam.

## II.     FACTS

### A.  <u>Background on Abortion Safety and Access</u>

Abortion is a fundamental component of comprehensive reproductive health care. In the United States, approximately 1 in 4 women will have an abortion by the age of 45. *See, e.g.*, Decl. of Mark Nichols, M.D., attached hereto as Ex. 2 ¶ 11. People have abortions for a wide variety of complex and often interrelated reasons. For example, people have abortions because, *e.g.*, they conclude that it is not the right time to become a parent or have additional children, they lack the necessary financial resources or a sufficient level of partner or familial support or stability, or because having a child or additional children would interfere with their educational and career goals. *See, e.g.*, Decl. of Sierra Washington, M.D., attached hereto as Ex. 3 ¶ 21; Decl. of Bliss Kaneshiro, M.D., attached hereto as Ex. 4 ¶ 12; Decl. of Shandhini Raidoo, M.D., attached hereto as Ex. 5 ¶ 11. Other people seek abortions because the pregnancy is the result of rape or incest, because continuing with the pregnancy could pose a risk to their health, or because of a fetal diagnosis. *Id*. The majority of abortion patients report a religious affiliation; of those patients, a majority identify as Catholic. Washington ¶ 21 n.6. A majority of women who have abortions already have at least one child. *Id.* at ¶ 20.

As a recent, robust analysis of abortion conducted by the National Academies of Sciences, Engineering, and Medicine ("NASEM") confirmed, legal abortion is one of the safest medical procedures or treatments provided in the United States today. Nichols ¶ 14; *see also* Washington ¶ 23; Kaneshiro ¶ 10; Raidoo ¶ 9.[2] Serious complications occur in less than one percent of abortions and abortion-related emergency room visits constitute just 0.01% of all emergency room visits by women of reproductive age in the United States. Nichols ¶ 14; Washington ¶ 24; Kaneshiro ¶ 26; Raidoo ¶ 25. Abortion-related mortality in the United States is lower than that

---

[2] The NASEM was established by Congress in 1863 to provide independent, objective expert analysis and advice to the nation to inform public policy. Nichols ¶ 14.

for colonoscopies, plastic surgery, dental procedures, and adult tonsillectomies. Kaneshiro ¶ 10; Raidoo ¶ 9.

Moreover, abortion is significantly safer than its only alternative—carrying a pregnancy to term and giving birth. Nichols ¶¶ 15–19; Washington ¶¶ 62–75; Raidoo ¶ 9; Kaneshiro ¶ 10. For example, in the United States, the risk of death (mortality) associated with childbirth is approximately 14 times greater than the risk of death associated with legal abortion. Nichols ¶ 15; Washington ¶ 63. Data suggest mortality associated with childbirth is even greater in Guam.[3]

Evidence overwhelmingly demonstrates that access to safe and legal abortion is extraordinarily important for public health. Nichols ¶¶ 18–24, 62–63, 71; Washington ¶¶ 61, 76–79. Studies show that people who are denied wanted abortions and forced to carry their pregnancies to term face not only the risks of complications from pregnancy and childbirth, which are significant, but they (and their children) also face an increased risk of physical and economic harm. Washington ¶ 76; Nichols ¶¶ 15–20; Raidoo ¶¶ 35–36; Kaneshiro ¶¶ 36–37. It is also well-documented, including in Guam, that when safe, legal abortion is unavailable or difficult to access, some people will resort to unsafe methods to terminate a pregnancy, which could result in serious complications and/or death. Compl. ¶¶ 51–53; Nichols ¶ 24; Washington ¶¶ 77–79; Kaneshiro ¶ 38; Raidoo ¶ 37. For example, in the nearby Philippines, where abortion has been criminalized for over a century, approximately 1,000 women die and approximately 100,000 women are hospitalized each year from complications of unsafe abortion. Washington ¶ 78.

Although legal abortion is very safe throughout pregnancy, the risks associated with it increase as pregnancy advances; each week that a patient is delayed can increase the risk of harm. Nichols ¶ 21; Washington ¶ 86; Raidoo ¶ 29; Kaneshiro ¶ 30. Delay can also push patients past the point in pregnancy at which a medication abortion is available, forcing patients to undergo

---

[3] According to the Centers for Disease Control and Prevention (CDC), the case-fatality rate for abortion for 2013–2017 was only approximately 0.44 deaths per 100,000 legal abortions. Washington ¶ 66. The average maternal mortality rate in Guam between 2008–2017 was approximately 27.0 deaths per 100,000 live births. *Id*.

more invasive, and usually more expensive, in-clinic abortion procedures. *Id.* That is why the American College of Obstetricians and Gynecologists (ACOG) and other leading medical professional organizations have affirmed that abortion is "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible." Nichols ¶ 21.

While most patients seek abortion as soon as they are able, raising funds to cover health care and travel costs are the most common reasons given for delaying access to care. Washington ¶¶ 82–84; *see also* Kaneshiro ¶ 31; Raidoo ¶ 30. Here, the significant financial and logistical obstacles imposed by travel to Hawai'i or beyond to access abortion can substantially delay or prevent access to care entirely. According to the most recent data available in the United States, most people seeking abortion live at or near the federal poverty level (FPL), Nichols ¶ 13, and the poverty rate in Guam is extremely high (22.5%)—higher than anywhere else in the 50 states or District of Columbia, Washington ¶ 65. The cost of an in-clinic medication abortion or abortion procedure in Hawai'i alone ranges from $400–$7,000 and many abortion patients lack insurance coverage for abortion. *See* Kaneshiro ¶¶ 32–33; Raidoo ¶¶ 31–32.[4] On top of the costs of care itself, Guam patients also face substantial air-travel costs (approximately $1,500 for a roundtrip, economy ticket) and out-of-pocket costs (*i.e.*, ground transportation, food, lodging, and lost wages) along with the logistical hurdles (*i.e.*, arranging and paying for childcare, obtaining time off of work) that come with a potentially multi-day trip. *See* Kaneshiro ¶¶ 34–35, 72–73; Raidoo ¶¶ 33–34, 71–72. The COVID-19 pandemic and ensuing disruptions in employment, childcare, transportation, and health insurance, along with travel restrictions, have only compounded these obstacles and added additional layers of risk and complexity to travel. Washington ¶ 85. For example, this past summer, it took one of Plaintiffs' patients and her husband several weeks to

---

[4] Both federal Medicaid and the federal insurance program for military members and dependents exclude coverage for abortion, except in very narrow instances. Compl. ¶¶ 77, 90. Even patients with private insurance may not have a plan that covers abortion or may have significant co-pays or deductibles. Kaneshiro ¶ 33; Raidoo ¶ 32.

secure funds and make arrangements to travel from Guam to Hawai'i; by the time she arrived, she required a far more expensive procedure that cost thousands of dollars. Kaneshiro ¶ 77. Moreover, Plaintiffs had to contact local government authorities in Hawai'i not only to ensure that the patient would be permitted to leave the mandatory quarantine at her hotel in order to get her abortion but also to ensure that her husband would be able to also leave the hotel to assist with transportation. *Id.* Another patient was forced to quarantine away from her family for two weeks upon her return to Guam. Raidoo ¶ 75; *see also* Compl. ¶ 86. For these reasons, and as discussed further below, by restoring access to abortion in Guam, expanding access to early abortion and reducing travel and associated delay, the use of telemedicine to provide medication abortion greatly benefits patient health and safety.

### B. <u>Medication Abortion and Telemedicine</u>

There are two main methods of abortion: procedural (sometimes referred to as "surgical") and medication abortion. Washington ¶ 25; Raidoo ¶ 12; Kaneshiro ¶ 13. Both methods are safe, effective means of terminating a pregnancy. Raidoo ¶ 12; Kaneshiro ¶ 13.[5] In 2000, the U.S. Food and Drug Administration ("FDA") approved a two-drug regimen—mifepristone and misoprostol—for medication abortion. Nichols ¶ 37; Washington ¶ 44. Medication abortion is typically available up to 10–11 weeks of pregnancy. Nichols ¶ 30; Kaneshiro ¶ 17; Raidoo ¶ 16. An identical regimen is also offered to patients experiencing a miscarriage. Nichols ¶ 31. To date, more than four million women have had a medication abortion in the United States, and a majority of patients 10-weeks-pregnant or less choose medication abortion over a first-trimester abortion procedure. Nichols ¶ 38; Washington ¶ 44; Kaneshiro ¶¶ 14, 27; Raidoo ¶¶ 13, 26.

---

[5] In the first and early second trimester, procedural abortions are generally performed by a clinician using gentle suction to empty the contents of the uterus (most commonly referred to as "aspiration abortion"). Nichols ¶ 26; Washington ¶ 28; Kaneshiro ¶ 13 n.5; Raidoo ¶ 12 n.5. This procedure is also used to treat early miscarriages. *Id.* Beginning in the early second trimester, procedural abortions are generally performed by the clinician dilating the cervix and using instruments to remove the contents of the uterus (referred to as a "dilation and evacuation" or "D&E" abortion). Washington ¶ 29; Nichols ¶ 27; Kaneshiro ¶ 13 n.5; Raidoo ¶ 12 n.5.

Both medications used in a medication abortion are approved by the FDA for self-administration by the patient without direct clinical supervision. Nichols ¶ 31; Washington ¶ 41. For this reason, abortion and miscarriage patients typically take the medications at home or in another location of their choosing. Nichols ¶¶ 29, 31. The FDA generally requires that authorized prescribers *dispense* mifepristone to patients in person at a medical office, clinic, or hospital (rather than through a pharmacy). Kaneshiro ¶ 18; Raidoo ¶ 17. However, some physicians (including Plaintiffs) have been permitted by the FDA to send mifepristone directly to patients for years, subject to compliance with certain FDA-approved protocols. *See infra* pp. 11–12. There are no such limitations on misoprostol, which can be obtained directly from a physician or from a pharmacy with a prescription, either by mail or in person. Kaneshiro ¶ 19; Raidoo ¶ 18.

In a medication abortion, the patient first takes the mifepristone and then takes the misoprostol, approximately 24- to 48-hours later. Washington ¶¶ 26, 41; Nichols ¶ 31; Kaneshiro ¶¶ 16, 20–21; Raidoo ¶¶ 15, 19–20. Approximately 2- to 24-hours after taking the misoprostol, the patient will experience cramping and bleeding and the passing of small blood clots, just like in an early miscarriage. Washington ¶¶ 26, 41; Nichols ¶ 31; Kaneshiro ¶¶ 21, 23; Raidoo ¶¶ 20, 22.[6] As noted above, the bleeding, cramping and passing of small blood clots that occur during a medication abortion are intended to occur—and virtually always do occur—while the patient is at home. Washington ¶ 42; Kaneshiro ¶¶ 16, 85, 87; Raidoo ¶¶ 15, 81, 83. Indeed, the primary difference between a medication abortion and an early miscarriage is that a miscarriage is usually unexpected and does not occur under such controlled circumstances. Kaneshiro ¶ 24; Raidoo ¶ 23.

As with all abortion, medication abortion is extremely safe. Nichols ¶¶ 37–41; Washington ¶¶ 50–58. Indeed, the FDA has acknowledged the impressive safety record of

---

[6] The assessment, counseling, prescription, and follow-up process for medication abortion is set forth more fully in the declaration of Plaintiffs' expert Dr. Washington, attached hereto. *See* Washington ¶¶ 31–43.

medication abortion and concluded that rates of major adverse events arising from medication abortion are exceedingly rare, generally far below 0.1%. Nichols ¶¶ 39, 41; Washington ¶ 51; Kaneshiro ¶ 26; Raidoo ¶ 25. A very small percentage of medication abortion patients may require some form of non-emergency follow-up care (*i.e.*, an additional dose of misoprostol or aspiration procedure) to complete the abortion, which is no different than the care provided to patients experiencing a miscarriage that has failed to complete naturally. Washington ¶¶ 54–57; Kaneshiro ¶ 25; Raidoo ¶ 24. Misoprostol can be obtained with a prescription from any pharmacy, and any OB/GYN can perform a uterine aspiration (the ability to do so is a requirement of board-certification). Washington ¶¶ 55–56.

Many people prefer medication abortion because it allows them to undergo the abortion in the privacy of their own home, may feel more natural than undergoing a medical procedure, and/or may provide a greater sense of control over the process. Nichols ¶¶ 33–34; Washington ¶¶ 45–46; Kaneshiro ¶¶ 27–28; Raidoo ¶¶ 26–27. For others, such as survivors of sexual assault, medication may be preferable to avoid having instruments placed in their vagina. Nichols ¶ 34; Washington ¶ 49; Kaneshiro ¶ 28; Raidoo ¶ 27. Those who may fear violence or retaliation if their abortion decision is exposed may choose medication abortion because it presents like a spontaneous miscarriage. Washington ¶ 47; Kaneshiro ¶ 28; Raidoo ¶ 27. Indeed, where it can be obtained by mail, medication abortion presents significant benefits over procedural abortion for patient privacy and confidentiality. This is particularly true for patients in Guam, as requiring an off-island trip likely requires multiple days away from home and work, and therefore makes it more difficult for Guam patients to keep their abortion decision private. *See* Kaneshiro ¶ 35; Raidoo ¶ 34; Washington ¶ 83. Finally, for patients with certain medical conditions, medication abortion has a lower risk of complications and failure than procedural abortion. Nichols ¶ 35; Washington ¶ 48.

Medication abortion is routinely provided to patients in a variety of settings, including by telemedicine. Indeed, telemedicine—the use of electronic information and telecommunications technologies to support the delivery of health care services remotely—is regularly used the world-over to counsel patients, obtain informed consent, and provide a wide range of medical care, including OB/GYN care. Nichols ¶¶ 42–52. Over the past decade, medication abortion has been provided via telemedicine throughout the United States, as well as abroad, and there is an extensive body of evidence demonstrating its safety and efficacy. Nichols ¶¶ 55–61, 73; Washington ¶ 98. Telemedicine medication abortion has also been incredibly important in expanding patient access, especially in underserved areas. Nichols ¶¶ 49, 62–65, 71; Raidoo ¶¶ 38, 44–45; Kaneshiro ¶¶ 39, 45–46. More recently, the COVID-19 pandemic has accelerated an increase in the use of telemedicine for OB/GYN care, including abortion, because it ensures patients can continue to access time-sensitive, comprehensive and also preventive care, while eliminating unnecessary in-person interactions for both patients and clinicians. Nichols ¶ 52; *see also* Washington ¶¶ 38, 91–92; Compl. ¶ 154 (describing expansion of telemedicine at Guam Regional Medical Center).

There is clear medical consensus that a clinician can evaluate a patient's eligibility for medication abortion, counsel the patient, and obtain informed consent entirely using telemedicine. *See, e.g.*, Nichols ¶¶ 53–67; Washington ¶¶ 32–38, 89–94. As the NASEM has concluded, "[t]here is no evidence that the dispensing or taking of [medication abortion pills] requires the physical presence of a clinician." Nichols ¶ 56.[7] For example, and as explained more fully in the attached declarations, a prescribing clinician does not have to conduct a physical examination of the patient to prescribe medication abortion; rather, a patient's eligibility for medication abortion can be determined through diagnostic testing (*e.g.*, ultrasounds, blood tests) obtained locally and then

_____

[7] ACOG has likewise concluded that "medication abortion can be provided safely and effectively by telemedicine." *Id.*

transmitted to and reviewed by the prescribing clinician; or, where medically appropriate, eligibility may be determined entirely through a "question and answer" assessment, again conducted by the prescribing clinician using telemedicine. Washington ¶¶ 33–36,. 90. This sort of dialogue with patients and review of records by telemedicine is extremely common for all manner of treatments and procedures. Nichols ¶¶ 46–52; Washington ¶¶ 90–92. Likewise, patient counseling and informed consent conversations occur over telemedicine just as they do in person; a clinician provides the same information, *e.g.*, through live videoconference, that they would during an in-person visit, and patients have the same opportunity to ask questions and receive answers in real time. Nichols ¶¶ 48, 51, 64, 74.

Plaintiffs have extensive experience with providing medication abortion through telemedicine. Since 2016, Plaintiffs have used a direct-to-patient telemedicine model,[8] pursuant to FDA-approved protocols, to prescribe and mail medication abortion to hundreds of eligible patients in Hawai'i—the majority of whom lived on islands where there are no abortion providers. Kaneshiro ¶ 39; Raidoo ¶ 38. As explained more fully in the attached declarations, there is no meaningful difference between the protocols Plaintiffs follow to provide a medication abortion in person versus through telemedicine. Kaneshiro ¶¶ 39–69; Raidoo ¶¶ 38–67; Washington ¶¶ 88–103. Patients using this service—known as the TelAbortion Project—have been able to access medication abortion without having to fly hundreds of miles and potentially stay overnight at a hotel; and without incurring travel costs, childcare costs, lost wages and/or jeopardizing the confidentiality of their abortion decision. Kaneshiro ¶ 46; Raidoo ¶ 45. Similar programs in Colorado, Georgia, Illinois, Iowa, Maine, Maryland, Minnesota, Montana, New Mexico, New

---

[8] Direct-to-patient telemedicine is telemedicine care in which the patient receives care without traveling to a clinical setting. Nichols ¶ 46. Direct-to-patient telemedicine often utilizes live videoconferencing and is frequently used for services such as medication management, the diagnosis and treatment of primary or urgent care concerns, and psychiatry and psychotherapy visits. *Id.*

York, Oregon, Washington, and the District of Columbia have served eligible patients in those and other states. Nichols ¶ 62.

In Plaintiffs' experience, as is reflected in the published research, patient satisfaction with telemedicine medication abortion is extremely high; many even find it preferable to in-person care. Kaneshiro ¶ 68; Raidoo ¶ 67; Nichols ¶¶ 57–59, 63. Some of Plaintiffs' patients have told them that, if it were not for telemedicine, they would not have been able to obtain an abortion at all. Kaneshiro ¶ 68; Raidoo ¶ 67. Not only does the availability of telemedicine reduce barriers to access by eliminating long travel distances (including, as here, significant air travel), but the increased flexibility and control over the time and setting of the appointment reduces stress and makes it easier for patients to include partners, family members, or other support people in the abortion process. *Id.* Even when abortion care is accessible locally, telemedicine offers increased privacy and providers report that telemedicine enables a more patient-centered approach to care. Nichols ¶¶ 63, 65; Kaneshiro ¶¶ 47, 68; Raidoo ¶¶ 46, 67. It is also substantially less expensive than an in-person abortion in Hawai'i, *see supra* p. 6, costing only approximately $240 (plus whatever a patient may have to pay to obtain a pre-test from a local health care provider). Kaneshiro ¶ 60; Raidoo ¶ 59.

### C.  Abortion Access in Guam

Historical, ethnographic and linguistic evidence dating back to the 18th century indicates that, over time, women in Guam and throughout the region have utilized a variety of methods to induce miscarriage or end their pregnancies. Bevacqua ¶¶ 12–19. More recently, prior to the legalization of abortion in Guam in 1978, those who could afford it flew to Hawai'i or Japan to obtain legal abortions. *Id.* at ¶ 22. Others were forced to obtain illegal abortions on the island. *Id.* However, in 1978, Senator Concepcion Barrett successfully amended the penal code to de-

criminalize abortion. *Id.* at ¶¶ 23–25; *see also* 9 G.C.A. § 31.20.[9] Most recently, between 2008–

17, approximately 200–300 people obtained abortions in Guam each year, the vast majority in the

first or early second trimester. Compl. ¶¶ 56–57. During this period, nearly 60% of Guam abortion

patients identified as Chamorro. *Id.* at ¶ 58.

In 2018, the last known doctor who provided abortions in Guam retired and, as has been

widely reported, no physicians have taken his place. Compl. ¶¶ 61–71; *see also* Raidoo ¶¶ 8, 69–

70, 78; Kaneshiro ¶¶ 9, 71, 81. As Governor Leon Guerrero herself has recognized, stigma against

abortion on the island makes it difficult to find local doctors willing to provide the service. Compl.

¶¶ 66–70. For example, Guam's extensive reporting requirements make it impossible for a

physician who provides abortion to protect their identity, and even the Governor's announcement

that she wanted to recruit a doctor to provide abortions to the island was met with protests. *See

id.* at ¶¶ 68, 70. As a result, hundreds of people who would otherwise access legal abortion on the

island each year are currently unable to exercise their constitutional rights and obtain a safe and

legal abortion in Guam without traveling thousands of miles by air. *Id.* at ¶ 72.

As set forth *supra* pp. 6–7, people seeking abortion in Guam face tremendous economic,

logistical and social barriers to accessing care off-island. If anything, the pandemic has given rise

to travel and severe quarantine restrictions that only make it more difficult for patients to afford,

arrange, and explain off-island travel. Kaneshiro ¶¶ 74, 77–79; Raidoo ¶¶ 73, 75–76; Compl. ¶¶

84–86. These substantial burdens prevent some patients from accessing abortion care altogether.

Compl. ¶ 93; Kaneshiro ¶ 79; Raidoo ¶ 76. Indeed, since 2018, Plaintiffs have spoken to multiple

individuals in Guam who wanted to come to Hawai'i to obtain an abortion, but for whom the

financial and logistical obstacles were too difficult to overcome; there are likely many more for

whom the prospect of traveling to Hawai'i is so daunting that they do not even reach out in first

---

[9] In his declaration, Plaintiffs' expert Dr. Michael Lujan Bevacqua more fully explains the ongoing efforts by women in Guam to maintain access to safe and legal abortion on the island, and why ensuring access to safe and legal abortion in Guam is consistent with Chamoru culture and history. *See* Ex. 1.

*Raidoo v. Camacho*
Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction                    Page **13** of **34**

place. Kaneshiro ¶¶ 73–74, 76; Raidoo ¶¶ 72–74, 76; *see also* Compl. ¶ 92 (describing 2019 case of 12-year-old victim of rape forced to continue her pregnancy). Some of these individuals have asked if they could obtain a medication abortion using telemedicine, Kaneshiro ¶ 75; however, the challenged laws currently prevent Plaintiffs from offering this service to patients in Guam. Unable to access care in Guam, these patients have no option but to carry their pregnancies to term against their will or to seek abortion care outside the medical system, placing their health and wellbeing at risk. *See supra* p. 5. These burdens fall disproportionately on Chamoru women and women with children (the majority of people seeking abortions in Guam, *see* Compl. ¶¶ 58–59); on poor and low-income women; on servicemembers, disproportionately women of color, who cannot leave the island without permission from their chain-of-command; and on women experiencing intimate partner violence (IPV). Compl. ¶¶ 74, 82, 91; Washington ¶¶ 47, 82–84; Decl. of Holly Rawlings, attached hereto as Ex. 6 ¶¶ 16–17, 23–24, 27.

Even patients who are ultimately able to overcome the immense obstacle of flying thousands of miles away face delays that expose them to increased risks to their health, as well as increased costs. *See supra* pp. 5–7; Compl. ¶ 94; Kaneshiro ¶¶ 30, 35 73; Raidoo ¶¶ 29, 34, 72. Furthermore, traveling off-island makes it difficult, if not impossible, for patients to keep their abortion decisions confidential, which may be important for many given the stigma against abortion in Guam. Kaneshiro ¶ 35; Raidoo ¶ 34; Washington ¶ 83; Compl. ¶¶ 66–70. This risk of exposure (and associated harms) is particularly heightened for those experiencing IPV. Washington ¶ 47; Nichols ¶ 65; *see also* Rawlings, Ex. 6.

### D. <u>Telemedicine Abortion in Guam</u>

Plaintiffs could easily expand their telemedicine practice to safely serve patients in Guam the same way they serve patients on Hawaiian Islands that have no abortion providers. Compl. ¶ 190; Raidoo ¶¶ 77–82; Kaneshiro ¶¶ 80–86; Washington ¶¶ 88–103; Nichols ¶¶ 68–70. This

would not only help restore abortion access to Guam, but also expand access to early abortion and reduce travel and associated delay, which would greatly benefit public health. *See supra* Facts, Sections II.A–B; *see also* Compl. ¶ 191. It would be particularly beneficial during the current pandemic because it would reduce unnecessary travel and in-person interactions. Compl. ¶ 191; Kaneshiro ¶ 83; Raidoo ¶ 79; Nichols ¶ 52, 71; Washington ¶ 88. Moreover, since previously most abortions in Guam already were provided in the first trimester, Compl. ¶ 57, offering medication abortion using telemedicine is well-suited to meet the existing need and would likely reduce the number of patients seeking abortions later in pregnancy, which would require off-island travel and imposes greater risks and costs. Compl. ¶ 192; Kaneshiro ¶ 84; Raidoo ¶ 80.

However, as discussed further below, the two challenged laws prevent Plaintiffs from providing medication abortion to patients in Guam through telemedicine, thereby effectively banning abortion care in Guam. First, the Clinic Requirement's outdated and ambiguous language provide Plaintiffs with no notice as to how to comply in the context of medication abortion and is subject to multiple and inconsistent interpretations by those who enforce it. *See* 9 G.C.A. § 31.20(b)(2) (requiring abortions "be performed" in an adequate clinical setting); *see also* Raidoo ¶¶ 83–84; Kaneshiro ¶¶ 87–88; Washington ¶ 96; Nichols ¶ 73. As such, Plaintiffs risk criminal penalties, along with disciplinary action against their license, if they use telemedicine to provide medication abortion to patients in Guam. Raidoo ¶¶ 84, 89; Kaneshiro ¶¶ 88, 93. Second, because the State-Mandated Information Law requires that certain information be provided to each abortion patient *in person*, Plaintiffs cannot use telemedicine to comply with this requirement. 10 G.C.A. §§ 3218.1(b)(1), (b)(2); *see also* Raidoo ¶¶ 85–87; Kaneshiro ¶¶ 89–92; Washington ¶¶ 93–95; Nichols ¶¶ 74–76. A patient's only option is to make a separate in-person trip to a different health care provider, simply to receive the information that could just as effectively be provided

over telemedicine. *Id.* Moreover, by requiring certain information be provided "individually" and "in a private room," the State-Mandated Information Law imposes burdensome and medically unnecessary restrictions on patients that will only exacerbate delays and undermine patient health, safety, and wellbeing. Kaneshiro ¶¶ 89–93; Raidoo ¶¶ 85–88; Nichols ¶¶ 74–77; Washington ¶¶ 93–95. Accordingly, absent relief from this Court, the challenged laws will continue to cause irreparable harm to Plaintiffs' patients' health, safety, and constitutional rights.

## ARGUMENT

To obtain a preliminary injunction a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit has "also articulated an alternate formulation of the *Winter* test, under which serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (internal citations and quotations omitted). Under this "sliding scale" approach, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Plaintiffs easily satisfy either formulation of the test.

## I. Plaintiffs Are Likely to Succeed on Their Claim That the Clinic Requirement Is Unconstitutionally Vague as Applied to Medication Abortion.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

A statutory prohibition is clearly defined if, and only if, it (1) affords a person of ordinary intelligence a "reasonable opportunity to know what is prohibited, so that the person may act accordingly," and (2) "provide[s] explicit standards for those who apply [it]," so as to protect against arbitrary and discriminatory enforcement. *Id.* There is a "heightened need for definiteness," and thus more exacting judicial review is required, where, as here, "a statute subjects violators to criminal penalties" and the uncertainty it creates "threatens to inhibit the exercise of constitutionally protected rights." *McCormack v. Herzog*, 788 F.3d 1017, 1029, 1031 (9th Cir. 2015) (internal citations and quotations omitted); *see also id.* at 1032–33; *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 554 (9th Cir. 2004) (given criminal penalties and "the potential for harassment of abortion providers, it is particularly important that enforcement of any unconstitutionally vague provisions of the scheme be enjoined"). Indeed, the Ninth Circuit has repeatedly affirmed injunctions against the enforcement of criminal abortion restrictions on vagueness grounds. *See, e.g.*, *Forbes v. Napolitano*, 236 F.3d 1009, 1012–13 (9th Cir. 2000), *amended*, 247 F.3d 903 (9th Cir. 2000), *and amended*, 260 F.3d 1159 (9th Cir. 2001); *McCormack*, 788 F.3d at 1030–33. Here, while the Clinic Requirement raises no vagueness concerns in the context of abortion *procedures*, its ambiguous and outdated language is unconstitutionally vague as applied to the provision of medication abortion. Thus, Plaintiffs are unable to use telemedicine to provide medication abortion to patients in Guam and the Clinic Requirement operates as a ban on pre-viability abortion in Guam.

As explained above, the Clinic Requirement requires that an "abortion [] be performed" in an "adequately equipped medical clinic or [hospital]." *See* 9 G.C.A. § 31.20(b)(2). The Clinic Requirement was enacted in 1978 as part of a statute intended to de-criminalize abortion and liberalize Guam's abortion laws consistent with the then-understanding of *Roe v. Wade*, but has not been amended or updated since that time. Bevacqua ¶ 24. At the time the Clinic Requirement

was enacted, medication abortion did not exist. Nichols ¶ 37 (mifepristone first approved by FDA in 2000); Washington ¶ 44 (same). Thus, consistent with the understanding of how abortions were provided in 1978, the Clinic Requirement, read literally, pre-supposes that a clinician will perform some sort of direct action that terminates the pregnancy and requires that act to occur in a clinical setting.

But this is not how medication abortion works. Unlike in a procedural abortion, where the uterus is evacuated and the pregnancy terminated by a clinician, *supra* note 5, a clinician providing medication abortion does not "perform" a procedure at all; rather, the clinician simply *prescribes* two medications to the patient, which the patient takes 24–48 hours apart, to induce the miscarriage-like process, *supra* pp. 7–8. And, unlike in a procedural abortion, a medication abortion patient does not pass the pregnancy in a clinical setting; rather, the pregnancy passes while the patient is at home (or in an alternative location of her choosing). *Supra* p. 8. Thus, unlike in a procedural abortion, the relative location of the patient and clinician at the moment the patient obtains the medications or even ingests the first medication is medically irrelevant. Nichols ¶ 73 n.48; *see also id.* at ¶ 56 at (NASEM concluding "there is no evidence to suggest" mifepristone must be provided in certain clinical facilities because "the abortion will occur outside the clinical setting").[10]

Accordingly, while what the Clinic Requirement requires of physicians performing abortion *procedures* may be clear—that is, that they "perform[]" such procedures and "terminate the [] pregnancy" in an adequate clinical setting—the same cannot be said of *medication abortion*. This ambiguity leaves abortion providers without any "reasonable opportunity to know what conduct is prohibited" by the Clinic Requirement when it comes to medication abortion and puts

---

[10] Indeed, as discussed above, one of the primary benefits of medication abortion is that it allows patients the ability to control when they initiate the process so that they can ensure they are at home (or a similar setting) when the pregnancy passes. *Supra* p. 8. The overwhelming body of evidence confirming the safety and efficacy of telemedicine medication abortion, including Plaintiffs' own experiences, merely underscores this fact. *Supra* Facts, Section II.B.

them in the position of having to "necessarily guess at [the Clinic Requirement's] meaning" in this context. *Tucson Woman's Clinic*, 379 F.3d at 554 (quoting *Planned Parenthood of Cent. & N. Ariz. v. Arizona,* 718 F.2d 938, 947 (9th Cir.1983)). For example, it would be reasonable to construe the operative act contemplated by the statute to be the act of prescribing and/or dispensing the two medications, regardless of where the patient is located at the time. This would not only accord with how medication abortion is provided but also with how abortion is defined in more recent legislation enacted in Guam. *See, e.g.*, 10 G.C.A. 3218.1(a)(1) ("Abortion means the use *or prescription* of any instrument, medicine, drug, or other substance or device to terminate [a] pregnancy") (emphasis added). It would also avoid the additional, and significant, constitutional issues raised if the law is construed to require the patient to obtain the medications in person, thereby prohibiting telemedicine. *See infra* pp. 21–27. And, as such, it would plainly be consistent with the legislative intent behind the Clinic Requirement, which was to bring Guam's abortion laws into compliance with federal constitutional standards, not restrict access to abortion.

However, there is simply no guarantee that those charged with enforcing the Clinic Requirement will not "differ as to [the Clinic Requirement's] application." *Tucson Woman's Clinic*, 379 F.3d at 554 (quoting *Planned Parenthood of Cent. & N. Ariz.*, 718 F.2d at 947). An alternative construction could interpret the operative act by the physician to be the act of handing medications to the patient. Although entirely medically unnecessary, this would require the prescribing physician and patient to be in the same physical location. Such an interpretation would effectively prohibit Plaintiffs from using telemedicine to provide medication abortion to eligible patients in Guam and operate as a ban on a pre-viability abortion in Guam. *See infra* pp. 21–27.

Without clear notice as to how to comply with the Clinic Requirement's vague language or a guarantee that the statute's enforcers will consistently (if ever) adopt a constitutionally

sufficient saving construction, Plaintiffs are left "between the Scylla of [] flouting state law and the Charybdis of forgoing . . . constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding." *Steffel v. Thompson*, 415 U.S. 452, 462 (1974). In short, Plaintiffs cannot use telemedicine to provide medication abortion to patients in Guam without risking criminal and other significant penalties. The Ninth Circuit has repeatedly found abortion statutes void-for-vagueness under just such circumstances. *See, e.g.*, *Forbes*, 236 F.3d at 1012– 13 (criminal abortion statute void-for-vagueness where doctors could conceivably construe vague terms to permit a particular course of action, but because "police, prosecutors, juries and judges [have] no standards to focus the statute's reach" the state might consider the same action to be "illegal under the statute"); *Tucson Woman's Clinic*, 379 F.3d at 555 (criminal abortion provision void-for-vagueness where understandings of what it requires are "widely variable" and it thus "subject[s] physicians to sanctions based not on their own objective behavior, but on the subjective viewpoints of others") (internal quotation marks omitted); *McCormack*, 788 F.3d at 1031–32 (criminal abortion statute void-for-vagueness where, *inter alia*, statute's requirements were "subjective and open to multiple interpretations" and the "lack of clarity may operate to inhibit [the provision of legal abortion services]") (internal quotation marks and citations omitted). Accordingly, Plaintiffs are likely to succeed on the merits of their claim that the Clinic Requirement is unconstitutionally vague as applied to medication abortion.[11]

---

[11] While enjoining the application of the Clinic Requirement on vagueness grounds would be consistent with Ninth Circuit precedent, should Defendants agree to a narrowing construction that would both provide Plaintiffs with adequate notice as to how to comply with the Clinic Requirement and establish clear standards to guide its enforcement in the medication abortion context, this Court could enter an order to that effect, *see United Food & Com. Workers Loc. 99 v. Bennett*, 934 F. Supp. 2d 1167, 1201 (D. Ariz. 2013) (adopting defendants' narrowing construction to cure unconstitutional vagueness consistent with First Amendment and legislative intent). However, as explained above, the only such narrowing construction that would not itself raise new constitutional issues would be one that does not require the patients to obtain the medication abortion in person.

**II.** **Plaintiffs Are Likely to Succeed on Their Claim That the Clinic Requirement and State-Mandated Information Law Violate Plaintiffs' Patients' Rights to Substantive Due Process.**

To the extent the Clinic Requirement and State-Mandated Information Law prohibit or otherwise restrict the use of telemedicine, the Restrictions cannot survive constitutional scrutiny.

Constitutional protections of the abortion right have the "same force and effect in Guam as in a state of the United States." *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1370 (9th Cir. 1992) (internal quotations omitted). For nearly five decades, the Supreme Court has not wavered from the central holding of *Roe v. Wade*, 410 U.S. 113, 163–64 (1973)—that a State may not prohibit any person from obtaining a pre-viability abortion. *See, e.g.*, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 871 (1992) ("The woman's right to terminate her pregnancy before viability is the most central principle of *Roe v. Wade*. It is a rule of law and a component of liberty we cannot renounce."). The Ninth Circuit has re-affirmed this "bright-line" rule: "Under controlling Supreme Court precedent, a woman has a right to choose to terminate her pregnancy *at any point* before viability . . . and the State may not proscribe that choice." *Isaacson v. Horne*, 716 F.3d 1213, 1227 (9th Cir. 2013) (emphasis in original).

However, even a law that does not prohibit abortion outright will still be unconstitutional if it imposes an undue burden on those seeking pre-viability abortion. *See, e.g.*, *id.* at 1225–27. "An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before [viability]." *Casey*, 505 U.S. at 878; *see also id.* at 877 ("undue burden is a shorthand" for "a substantial obstacle in the path of a woman seeking an abortion").[12] Although, "[a]s with any medical procedure, the

---

[12] As other courts have recognized, the distinction between the bright-line and undue burden tests is often more theoretical than actual: Any law that prohibits pre-viability abortion necessarily constitutes an undue burden because the "obstacle [it poses] is insurmountable, not merely substantial." *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 276 (5th Cir. 2019); *see also Little Rock Fam. Plan. Servs. v. Rutledge*, 398 F. Supp. 3d 330, 384 (E.D. Ark. 2019) (enjoining pre-viability abortion ban and recognizing that "even if the Court [were] to apply the undue burden

State may enact regulations to further the health or safety of a woman seeking an abortion[,] [u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Id.* at 878; *see also Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 913 (9th Cir. 2014) (same). As the Supreme Court has long recognized, laws restricting abortion access in the name of patient safety must be grounded in actual evidence, not merely conjecture or government say-so. *See, e.g.*, *Doe v. Bolton*, 410 U.S. 179, 195 (1973) (striking restriction where state failed to provide "persuasive data" that law advanced patient health and safety); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2311 (2016). Moreover, while a "State may take measures to ensure that the woman's [decision to have an abortion] is informed," *Casey*, 505 U.S. at 878, the means chosen to further this interest "must be calculated to inform the woman's free choice, not to hinder it," *id.* at 877. In short, regardless of the test applied, prior to viability *no* state interest is "strong enough [*either*] to support a prohibition of abortion *or* the imposition of a substantial obstacle to the woman's effective right to elect the procedure." *Id.* at 846 (emphasis added).

Importantly, "[n]either the Supreme Court nor [the Ninth Circuit] has ever held that a burden must be absolute to be undue." *Humble*, 753 F.3d at 917. Rather, it is well-settled that burdens that fall short of preventing abortion access outright may nevertheless constitute an undue burden. *See June Medical Servs., LLC v. Russo*, 140 S. Ct. 2103, 2129–30 (2020) (finding substantial obstacle where "[w]omen not altogether prevented from obtaining an abortion would face other burdens" including "delays . . . [that] increase the risk . . . [of] complications from the procedure and may make it impossible . . . to [obtain] a medication abortion"); *id.* at 2140 (Roberts, C.J., concurring) (finding substantial obstacle from "increase[d] travel distance" to abortion providers, "exacerbat[ing]" some patients' "difficulty affording or arranging for

---

analysis [to the ban], the Court likewise finds [it] not only places a 'substantial,' but an insurmountable, obstacle in the path of women . . . seeking pre-viability abortions.").

transportation and childcare on the days of their clinic visits"); *Hellerstedt*, 136 S. Ct. at 2313, 2318 (finding substantial obstacle where patients are forced to "travel long distances to get abortions").

To determine whether a burden is substantial, courts evaluate "the burdens a law imposes on abortion access together with the benefits th[e] law[] confer[s]." *Hellerstedt*, 136 S. Ct. at 2309 (citation omitted).[13] "The feebler the medical grounds, the likelier the burden, even if slight, is to be undue." *Humble*, 753 F.3d at 914. Courts must also consider "the ways in which [an] abortion regulation interacts with women's lived experience, socioeconomic factors, and other abortion regulations." *Humble*, 753 F.3d at 915; *see also June Medical*, 140 S. Ct. at 2140 (Roberts, C.J., concurring).

Applying these principles in *Humble*, the Ninth Circuit considered a law that forced abortion providers to follow an outdated protocol for medication abortion; specifically, it required prescribers to limit medication abortion to seven weeks of pregnancy and use a more expensive and less effective regimen, and required patients to make additional visits to the clinic to obtain care. The Ninth Circuit concluded that the law "substantially burden[ed] women's access to abortion services" and could not withstand constitutional scrutiny. *Humble*, 753 F.3d at 916. "For a significant number of women, the law [would] effectively ban medication abortions outright." *Id.* at 915. However, the court also found "the burden imposed by the Arizona law [] undue even

---

[13] Although Chief Justice Roberts criticized this balancing test in his concurrence in *June Medical Services, LLC v. Russo* ("*June Medical*")—arguing instead that courts should strike abortion restrictions either because they impose a substantial obstacle (without regard to the benefits) *or* are not reasonably related to a legitimate state interest—his criticism is not controlling, and the test remains good law. 140 S. Ct. 2103, 2138 (Roberts, C.J., concurring). As an initial matter, the Chief Justice was clear that *Hellerstedt* endures: "The question today . . . is not whether [*Hellerstedt*] was right or wrong but whether to adhere to it in deciding the present case." *June Medical*, 140 S. Ct. at 2133 (Roberts, C.J., concurring). Moreover, under Ninth Circuit precedent, a concurrence is only controlling under these circumstances when it "posits a narrow test to which the plurality *must necessarily agree* as a logical consequence of its own, broader position." *Cardenas v. United States*, 826 F.3d 1164, 1171 (9th Cir. 2016) (emphasis added) (quoting *United States v. Epps*, 707 F.3d 337, 348 (D.C. Cir. 2013)). Here, the *June Medical* plurality expressly applied the test the Chief Justice rejected, 140 S. Ct. at 2120, and thus it can hardly be said that the plurality "must necessarily agree" with the Chief Justice's rejection of its own test. Notwithstanding that courts outside the Ninth Circuit have reached a different conclusion, *see, e.g.*, *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 978 F.3d 418 (6th Cir. 2020); *Hopkins v. Jegley*, 968 F.3d 912 (8th Cir. 2020), Ninth Circuit case law is clear.

if some women . . . nonetheless obtain an abortion." *Id.* at 917. For example, the law would decrease the availability of abortion providers, requiring patients to travel longer distances to obtain care. *Id.* at 916. The law also increased the costs of the medication by approximately $200, and by increasing the number of visits to the clinic—at often greater distances—the law increased "costs to the patient for transportation, gas, lodging, and the time she must take off from work" to obtain care. *Id.* at 915–16. In turn, these increased costs could cause delays in accessing care, increasing the risks from the abortion procedure. *Id.* at 916. Notably, the fact that the law did not directly impact the availability of other abortion methods in Arizona "d[id] not preclude a finding of an undue burden." *Id.* at 917.

At the same time, the Ninth Circuit found the challenged law was "wholly unnecessary as a matter of women's health." *Id.* at 915 (internal citations and alterations omitted). To the contrary, the court found there was "no supporting evidence for any asserted legislative fact," and, if anything, the evidence showed the law undermined patient health. *Id.* at 914–15. The law at issue thus substantially burdened patient access to abortion care while conferring no benefit, imposing a clear undue burden.

Following this precedent, and as set forth further below, it is plain that the challenged laws cannot withstand constitutional scrutiny. First, to the extent it prohibits Plaintiffs from using telemedicine to provide abortions in Guam, the Clinic Requirement essentially eliminates the only means of obtaining a pre-viability abortion in Guam, thereby violating the bright-line rule against abortion bans. Second, as applied to telemedicine, the State-Mandated Information Law both burdens and restricts patients' access to abortion, while failing to advance any legitimate state interest in patient health or informed consent. Accordingly, Plaintiffs are extremely likely to succeed on the merits of their claim that these laws are unconstitutional.

**A. Clinic Requirement**

As Plaintiffs are the sole known physicians willing to provide abortion care to patients in Guam, to the extent the Clinic Requirement prohibits them from providing telemedicine medication abortion to Guam-based patients, it "does not just restrict a woman's right to choose a particular *method* of terminating her pregnancy before viability; it eliminates a woman's 'right to choose abortion itself.'" *Isaacson*, 716 F.3d at 1226 (emphasis in original) (quoting *Stenberg v. Carhart*, 530 U.S. 914, 930 (2000)). The Clinic Requirement thus leaves "thousands of… women with no practical means of obtaining a safe, legal abortion." *June Medical*, 140 S. Ct. at 2130. This alone is sufficient to render the Clinic Requirement unconstitutional as applied to telemedicine medication abortion under any test. *Casey*, 505 U.S. at 846 ("Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure.").[14]

That some patients, at great personal cost and likely increased risk to their health, are ultimately be able to access abortion off-island is irrelevant. Guam cannot escape its constitutional obligations to its citizens by relying on the availability of abortion in other jurisdictions. *See, e.g.*, *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 350 (1938) (state's refusal to admit African-American students to state law school cannot be rendered constitutional by availability of adjacent states' law schools); *Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 918–19 (7th Cir. 2015) (rejecting as "untenable" argument that abortion restriction could be justified by looking outside Wisconsin's borders because "no State can be excused from performance by what another State may do or fail to do") (internal quotations and citations omitted); *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 457–58 (5th Cir. 2014), *cert. denied*, 136 S. Ct. 2536 (2016) (holding that "*Gaines* locks the gate for Mississippi to escape to another state's protective

---

[14] Indeed, even if it was not considered an outright ban, by blocking patients from obtaining medication abortion pursuant to evidence-based protocols, while providing no medical benefit and only undermining patient health and safety, the Clinic Requirement is unconstitutional under *Humble*. *See* 753 F.3d at 914–917.

umbrella and thus requires us to conduct the undue burden inquiry by looking only at the ability of Mississippi women to exercise their right within Mississippi's borders"). Indeed, neither the Supreme Court nor the Ninth Circuit has ever considered the availability of out-of-state abortion to be legally relevant when assessing the constitutionality of a law prohibiting or otherwise restricting pre-viability abortion.

Moreover, the Clinic Requirement could not survive constitutional scrutiny even if the availability of out-of-state abortion was legally relevant. Because of the Clinic Requirement, people seeking abortions in Guam are nearly *four thousand* miles (one way) from a legal abortion. *Supra* p. 1. Both the Supreme Court and the Ninth Circuit have held *intra-state* travel distances of a far lesser magnitude unconstitutional, regardless of whether some patients can ultimately make the journey. *June Medical*, 140 S. Ct. at 2130 (1–5 hour driving distance) (plurality); *id.* at 2140 (Roberts, C.J., concurring) (320-mile driving distance); *Hellerstedt*, 136 S. Ct. at 2313 (150–200 mile driving distance); *Humble*, 753 F.3d at 916 (300–700 mile driving distance). Indeed, the additional costs relating to travel alone are over a thousand dollars, *supra* p. 6—far more than the hundreds of dollars previously recognized as unconstitutional. *See, e.g.*, *Humble*, 753 F.3d at 915. And that does not even include the other costs, logistical burdens, and delay and increased health risks associated with such extensive, likely multi-day travel. *Supra* pp. 5–7. As the Supreme Court and Ninth Circuit have repeatedly recognized, such burdens pose substantial, if not insurmountable obstacles, particularly for patients who have children and/or are living in poverty or have low incomes. *See, e.g.*, *June Medical*, 140 S. Ct. at 2140 (Roberts, C.J., concurring); *Humble*, 753 F.3d at 915–16 (finding substantial obstacle where "difficulties … in obtaining time off from work" and "increase[d] costs to the patient for transportation, gas, lodging" may be "prohibitive" for some women, including poor women); *id.* at 915 (restriction imposed undue burden because it "delay[ed] and deter[red] patients obtaining abortions, and that delay in abortion

increases health risks") (quoting *Eden*, 379 F.3d at 542).[15] In short, even if access to out-of-state abortion is considered, the evidence overwhelmingly establishes that the burdens on abortion access here far exceed those that binding precedent has already recognized to be unconstitutional.

For all these reasons, Plaintiffs are extremely likely to succeed on the merits of their claim that the Clinic Requirement is unconstitutional as applied to telemedicine medication abortion.

**B.** ***State-Mandated Information Law***

To the extent it prohibits Plaintiffs from using telemedicine to provide patients with certain mandated information prior to abortion and restricts patients' ability to receive that information in a safe and supportive environment, all the while providing no benefit to patient health or informed consent, the State-Mandated Information Law is likewise unconstitutional. As explained above, even though states may enact laws mandating that patients receive certain information prior to providing informed consent to abortion, such laws "must be calculated to inform the woman's free choice, not hinder it." *Casey*, 505 U.S. at 877. As such, courts have not hesitated to enjoin those applications of state-mandated information laws that "serve[] no legitimate state interest and make[] little sense under the circumstances." *Karlin v. Foust*, 188 F.3d 446, 489 n.16 (7th Cir. 1999) (construing exception to state-mandated information requirement for patients with lethal fetal diagnoses); *see also Summit Med. Ctr. of Ala., Inc. v. Siegelman*, 227 F. Supp. 2d 1194, 1202–03 (M.D. Ala. 2002), *amended* Oct. 14, 2002 (same). Moreover, because the evidence shows these restrictions are "wholly unnecessary" in this context, the burdens imposed on patients are not justified. *See Hellerstedt*, 136 S.Ct. at 2309; *see also*

---

[15] While no state interest is sufficient to justify the effect of the Clinic Requirement on the availability of pre-viability abortion in Guam, *see Casey*, 505 U.S. at 846, the evidence plainly shows that any health-related justification for the Clinic Requirement is not "merely feeble, [it is] non-existent," *Humble*, 735 F.3d at 917. The safety, efficacy, and benefits of telemedicine medication abortion are well-established. *Supra* pp. 8–11. If anything, the evidence overwhelmingly shows that blocking Plaintiffs from providing medication abortion to eligible patients in Guam only undermines the short-term and long-term health and wellbeing of people in Guam. *Supra* pp. 5–7.

*Humble*, 753 F.3d at 914 ("The feebler the medical grounds, the likelier the burden, even if slight, is to be undue.")

**First**, by requiring the provision of certain information to abortion patients *in person* at least 24 hours prior to an abortion, *see* 10 G.C.A. §§ 3218.1 (b)(1), (b)(2), the State-Mandated Information Law prohibits Plaintiffs from using live, videoconference technology to comply with that statute. Plaintiffs' patients already undergo a comprehensive assessment, counseling, and informed consent process with Plaintiffs during a live, face-to-face videoconference, which already covers much of the information required under the statute. *Compare* 10 G.C.A. § 3218.1(b)(1) *and* Kaneshiro ¶¶ 50–69; Raidoo ¶¶ 49–67. Plaintiffs could just as easily deliver the rest of the statutorily-mandated information during the same appointment and answer any patient questions in real time.[16] Yet this does not satisfy the State-Mandated Information Law; instead, to satisfy the law, patients will be forced to make a separate visit to a different clinician in Guam solely to receive the mandated information *in person*—even though that clinician does not provide abortions and may not even have the medical knowledge to answer a patient's questions about the information provided. *See id.* at (a)(13), (b)(1), (b)(2) (allowing, *e.g.*, a psychologist, to provide the patient information about, *e.g.*, the "probably anatomical and physiological characteristics" of the fetus and "the need for anti-Rh immune globulin therapy").

This not only fails to advance any legitimate interest in informed consent, it is also simply irrational. The government cannot conceivably claim that it is necessary or even preferable to require patients to undertake an additional, separate trip just to get the information from a different clinician in Guam, when the physicians providing the abortion could deliver the exact same information, face-to-face, through a live, videoconference and answer any questions in real time. Indeed, there is ample evidence showing there is no meaningful difference between obtaining

---

[16] If permitted to provide the mandated information by telemedicine, Plaintiffs could email patients a "copy" of the required pamphlet and would not prescribe and dispense the medication abortion until at least 24-hours had elapsed from the provision of the oral and written information.

*Raidoo v. Camacho*
Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction                    Page **28** of 34

informed consent through a live, face-to-face teleconference and doing so in person. Nichols ¶¶ 48, 51, 60, 64, 74; Washington ¶¶ 37–38, 93–94; Kaneshiro ¶¶ 55–59; Raidoo ¶¶ 54–58. As the evidence shows, clinicians regularly use telemedicine to counsel patients about the risks, benefits, and alternatives to their treatment options, and otherwise ensure their decisions are voluntary and informed, not only for a range of OB/GYN care, but across all areas of medicine. Nichols ¶¶ 48, 51, 74; Washington ¶¶ 37–38, 91–94. Nor are there any limits in Guam law on using telemedicine to provide such counseling in any other context. *See, e.g.*, Compl. ¶ 154.

What is more, the burdens imposed by prohibiting the use of telemedicine in this manner are significant. For example, to obtain the requisite information "in person" a patient would have to disclose their abortion decision to another clinician in Guam. As other courts have recognized, the unnecessary "exposure of private or confidential information" relating to abortion is a substantial obstacle. *Planned Parenthood Se., Inc. v. Strange*, 9 F. Supp. 3d 1272, 1289 (M.D. Ala. 2014); *see also Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1355, 1363 (M.D. Ala. 2014) (enjoining regulation that forced abortion patients to suffer "invasion of privacy" and "forgo their medical confidentiality"); *cf. Planned Parenthood Minn., N.D., S.D. v. Daugaard*, 799 F. Supp. 2d 1048, 1061 (D.S.D. 2011) (enjoining law that "force[d] the woman against her will to disclose her decision to undergo an abortion").

Moreover, even if the patient does not have to leave the island, these unnecessary visits to additional health care providers, and the resources they require, impose financial and logistical burdens, *see Humble*, 753 F.3d at 915–16 (holding law requiring additional in-state clinic visits imposed undue burden by "increas[ing] costs to the patient for transportation, gas . . . and the time she must take off from work"), which can also make it harder to keep their abortion decision confidential, *see e.g.*, Nichols ¶ 76; Washington ¶ 47; *W. Ala. Women's Ctr. v. Williamson*, 120 F. Supp. 3d 1296, 1310 (M.D. Ala. 2015) (recognizing that being forced to disclose plans for

abortion care "may present risks to women's employment and safety"). These burdens become even more difficult to justify in the midst of the current pandemic when travel and in-person interactions, particularly in a health care facility, exposes patients and clinicians alike to increased risks. Nichols ¶¶ 52, 74; Washington ¶ 85.

**Second,** by imposing unreasonable requirements on telemedicine patients concerning the setting in which they receive the mandated information, the State-Mandated Information Law likewise serves no legitimate state interest and imposes unjustified burdens on patients.[17] The State-Mandated Information Law requires the information be provided to the patient "individually and in a private room" to "protect her privacy and maintain the confidentiality of her decision and to ensure that the information focuses on her individual circumstances and that she has an adequate opportunity to ask questions." 10 G.C.A. § 3218.1(b)(4). Certainly, Plaintiffs always take necessary steps to protect the privacy and confidentiality of their telemedicine patients, including by utilizing a secure Internet platform; they never provide "group" counseling to more than one abortion patient at a time, and are not seeking the ability to do so here; and they always address any and all of each individual patient's questions and concerns. Kaneshiro ¶¶ 51–59, 92; Raidoo ¶¶ 50–58, 88. But many of the privacy concerns that relate to in-person counseling at a health care facility simply do not apply in the context of telemedicine. For example, it is nonsensical to prevent a patient using telemedicine from choosing to *receive* the mandated information while seated in their living room with their partner, while a child plays in the corner, if that is the best option for them.

Nor can the government seriously argue that *removing* trusted friends and loved ones from the process actually "inform[s]" the patient. *Casey*, 505 U.S. at 877. In fact, in his signing

---

[17] Although the penalties under 10 G.C.A. § 3218.1 run to the physician performing the abortion (or another "qualified person"), not the patient, in the context of telemedicine this means that, to avoid liability, Plaintiffs cannot provide patients with the information mandated under the statute unless the patients comply with the "individually and in a private room" requirement.

statement to the State-Mandated Information law, then-Governor Calvo explained that one of the purposes of the law was to provide "accurate information" to "women who face the agonizing decision – most often, alone – of whether to carry their unborn child to term."[18] As such, it would be absurd to defend these restrictions on the basis that it is actually in the government's interest to force patients *against their will* to go through the process alone.[19]

Indeed, the evidence shows that among the many advantages of telemedicine is that patients have more flexibility to schedule their appointments, allowing them to include people they trust in their decision-making process, and can protect their confidentiality by avoiding the need to schedule and travel to a clinical facility for an appointment. *Supra* p. 12. There is no justification for undermining these benefits *solely* for patients who use telemedicine for abortion. By contrast, requiring patients to jump through any number of hoops to create the statutorily-mandated setting will only burden patients. For example, patients may have to take time off from work, find childcare, etc. just to find an "individual" and "private" space, which imposes unnecessary financial and logistical burdens. People seeking abortions are just as competent to decide whether and whom to include in their decision-making process and the safest and most appropriate setting to engage with a clinician over telemedicine as people seeking any other form of health care.

*     *     *

---

[18] Letter from Eddie Baza Calvo, Gov. of Guam, to Judith Won Pat, Speaker of the Guam Legislature (Nov. 6, 2012), http://www.guamlegislature.com/Public_Laws_31st/P.L.%2031-235%20-%20SBill%20No.%2052-31%20(COR).pdf.

[19] For these reasons, Plaintiffs believe it would be consistent with legislative intent and resolve the constitutional flaws discussed herein if Defendants interpreted the statute to impose limitations on the ability of the physician performing the abortion or another qualified person to, *e.g.*, provide group counseling to patients or otherwise take steps to diminish a patient's privacy, but not as a limitation on a telemedicine patient's ability to control where and with whom they receive the information.

In sum, because they fail to advance any legitimate state interest in patient health or informed consent in this context and impose unjustified burdens on patients, these restrictions impose an undue burden and cannot stand.

## III. Plaintiffs and Their Patients Will Suffer Irreparable Harm Absent Injunctive Relief.

"[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."), *rev'd on other grounds*, 562 U.S. 134 (2011); *Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("[A]n on-going violation [of the constitutional right to privacy] constitutes irreparable injury" because "invasions of privacy, because of their intangible nature, could not be compensated for by monetary damages; in other words, plaintiffs could not be made whole.") (internal citations omitted), *overruled on other grounds*, 508 U.S. 656 (1993). Because the challenged statutes violate the due process rights of Plaintiffs and their patients, this alone is sufficient to constitute irreparable harm. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). However, the evidence also shows that, absent injunctive relief, Plaintiffs' patients will suffer numerous additional "harm[s] for which there is no adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). For example, by blocking pre-viability abortion in Guam, the challenged laws force people seeking abortion in Guam to travel several thousands of miles for a safe and legal abortion—delaying their ability to access care and depriving some of the ability to have an abortion entirely. *Supra* pp. 6–7, 14. As such, the challenged laws inflict precisely the sort of physical and emotional injury that constitute irreparable harm. *See, e.g., Harris v. Bd. of*

*Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (plaintiffs established likelihood of irreparable harm where evidence showed they would experience pain, complications, and other adverse effects due to delayed medical treatment); *Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013) (finding irreparable harm where "women who carry unwanted pregnancies to term are at increased risk of death and childbirth complications" and delay in seeking abortion "also carries a heightened risk of medical complication"). Additionally, the challenged laws inflict irreparable harm by jeopardizing the ability of people in Guam to keep their abortion decision confidential, *supra* pp. 9, 14. Certainly, "[n]o remedy at law could adequately compensate [Plaintiffs' patients] for any physical, psychological, or emotional trauma they might suffer at the hands of one obtaining this personal information." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1069 (6th Cir. 1998). As such, Plaintiffs readily satisfy the second injunctive relief factor.

**IV.    The Balance of Equities Strongly Favors Plaintiffs and the Public Interest Is Served by An Injunction.**

Finally, "by establishing a likelihood that Defendants' [laws] violate[] the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal.*, 757 F.3d at 1069. As explained above, absent an injunction, the challenged laws prevent people in Guam from exercising their constitutional rights and accessing safe and legal abortion on the island and, in so doing, subject them to many significant and irreparable physical, mental, and emotional harms. Defendants, by contrast, "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Moreover, as the Ninth Circuit has repeatedly held, "it is always in the public interest to prevent the violation of a party's

constitutional rights." *Melendres*, 695 F.3d at 1002 (citation omitted). Accordingly, Plaintiffs satisfy the remaining criteria for injunctive relief.

<b>CONCLUSION</b>

For the reasons discussed above, Plaintiffs respectfully request that the Court enjoin the Clinic Requirement and the State-Mandated Information Law as applied to the provision of medication abortion and use of telemedicine to provide medication abortion to patients in Guam.

Respectfully submitted this 5th day of February, 2021.

**LAW OFFICE OF VANESSA L. WILLIAMS, P.C.**
*Attorney for Plaintiffs Shandhini Raidoo, M.D., M.P.H. and Bliss Kaneshiro, M.D., M.P.H.*

_____
VANESSA L. WILLIAMS, ESQ.