# THE DISTRICT COURT OF GUAM

| | |
|---|---|
| SHANDHINI RAIDOO, *et al.*, <br><br> Plaintiffs, <br><br> vs <br><br> LEEVIN TAITANO CAMACHO, *et al.*, <br><br> Defendants. | CIVIL CASE NO. 21-00009 <br><br> **REPORT AND RECOMMENDATION RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUCTION** |

On February 5, 2021, Plaintiffs Bliss Kaneshiro, M.D., and Shandhini Raidoo, M.D., filed a preliminary injunction motion pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. ECF No. 12. The court heard oral argument on the motion on March 19, 2021. ECF No. 31. For the reasons set forth herein, the court recommends that the drastic remedy of a preliminary injunction be denied because Plaintiffs have not sufficiently shown that Guam's law requiring that certain information be provided in-person unduly burdens a woman's constitutional right to an abortion.

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

Abortion has been a contentious issue for several decades in Guam and continues to be so today. The practice was criminalized up until 1978—when it was decriminalized pursuant to 9 G.C.A. § 31.20 in the wake of *Roe v. Wade*—only to be banned again by the Guam Legislature in 1990. Compl. ¶¶ 37, 39-40, 44, ECF No. 1; *see Roe v. Wade*, 410 U.S. 113 (1973). After the

ban was challenged in court, the Ninth Circuit deemed the law unconstitutional. Compl. ¶¶ 45-55, ECF No. 1; *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366 (9th Cir. 1992), *as amended* (June 8, 1992), *cert. denied*, 506 U.S. 1011 (1992). Abortion has been legal on Guam ever since, and from 2008 to 2017, approximately 200-300 yearly abortions were performed. *See* Compl. ¶¶ 55-56, ECF No. 1.

In 2018, the last abortion physician on Guam retired, and no local doctor has stepped in to fill the vacancy. Thus, no known abortion has occurred on Guam since 2018. Compl. ¶¶ 61-62, 71, ECF No. 1. While Plaintiffs claim there are physicians on Guam willing to provide pre- and post-abortion care, none are willing to provide abortion services directly, as "[a]nti-abortion stigma discourages even supportive local doctors from incorporating abortion services into their practice." Compl. ¶¶ 65-67, ECF No. 1.

Enter the two Plaintiffs in this case, Plaintiffs are Guam-licensed, board-certified OB-GYNs experienced in providing abortion services. Compl. ¶¶ 10-15, ECF No. 1. However, Plaintiffs do not reside on Guam. They reside in Hawaii. *Id.* They have brought this lawsuit seeking to remotely supply "medication abortions" to patients on Guam through telemedicine. As described by Plaintiffs, a medication abortion is different from other abortion procedures performed in clinics by a doctor because it is entirely self-administered by the patient herself. Compl. ¶ 134, ECF No. 1. To obtain the medication abortion, the patient orally ingests a regimen of mifepristone, and then misoprostol, approximately 24-48 hours apart. Compl. ¶ 130, ECF No. 1. The medication causes the fetal tissue to detach from the uterine wall, which is then expelled through the uterus, mimicking an early miscarriage. Compl. ¶ 131, ECF No. 1.

Normally, a woman would need to receive abortion medication in-person. However, an ongoing FDA-approved clinical study has allowed certain doctors to send abortion medication directly to patients. Compl. ¶¶ 133, 164-169, ECF No. 1. Consequently, Plaintiffs have generally

administered medication abortions entirely by telemedicine. Compl. ¶¶ 12, 15, 164-166, ECF No. 1. Under this model, Plaintiffs conduct initial and follow up-consultations via teleconference and deliver the medication by mail, but never meet with the patient in-person. Compl. ¶¶ 151, 169, ECF No. 1. If any in-person procedures are necessary, such as ultrasounds or lab tests, the patient undergoes the procedures at nearby medical facilities. *Id.*

The record demonstrates that medication abortion is safe. The chance of a major adverse health event is "exceedingly rare, generally far below 0.1%." Compl. ¶ 136, ECF No. 1. Still, in about 1-5% of cases, the process results in an "incomplete abortion," and in about 0.8-2.9% of cases, the process results in an "ongoing pregnancy." Compl. ¶¶ 137-38, ECF No. 1. In the case of an incomplete abortion or ongoing pregnancy, an in-person procedure may be required to complete the abortion, although sometimes this can be performed remotely. *Id*. Follow-up visits are encouraged after the medication abortion to ensure the medication abortion was successful, either via telemedicine or in-person. Compl. ¶¶ 185-87, ECF No. 1.

Medication abortion is usually only available for up to 10 to 11 weeks of the pregnancy. Compl. ¶ 135, ECF No. 1. A woman's eligibility for a medication abortion must sometimes be determined by way of ultrasounds and lab results to confirm the existence and duration of the pregnancy and/or rule out ectopic pregnancies. *Decl. of Bliss Kaneshiro, M.D.*, ¶¶ 50-56, ECF No. 13-4; *Decl. of Shandhini Raidoo, M.D.*, ¶¶ 49-56, ECF No. 13-5. This pre-abortion testing is not medically necessary for all women, and some woman already have this information by the time they begin seeking an abortion. *Id.*

Plaintiffs seek to provide medication abortion on Guam from Hawaii via telemedicine. But they allege that they are prevented from doing so by 10 G.C.A. § 3218.1. While not explicitly banning medication abortion,[1] Section 3218.1 requires "the physician who is to

---

[1] Plaintiffs also challenged the constitutionality of 9 G.C.A. § 31.20, contending that it banned medication abortions

perform the abortion or a qualified person" to provide a woman seeking an abortion information that "a reasonable person would consider material to the decision of whether or not to undergo the abortion" twenty-four hours before the abortion is set to occur. § 3218.1(b)(1)(B). This information includes "a description of the abortion method," the risks it poses, the "probable gestational age of the unborn child," the "probable anatomical and physiological characteristics of the child," public assistance available to support the child, available adoption services, and the legal responsibilities of the father. *Id*. § 3218.1(b)(1)-(2).

The law imposes misdemeanor criminal penalties and creates private causes of action against physicians who violate these requirements. *Id.* § 3218.1(f)-(g). The Guam Board of Medical Examiners may initiate disciplinary action, including the revocation or suspension of the physician's medical license, for violations of Section 3218.1. *Id.* § 12209(d).

Plaintiffs do not challenge the nature of the information to be given. Nor do they challenge the twenty-four-hour waiting period. What Plaintiffs do take issue with is the two-word requirement injected at the end of the opening lines of Section 3218.1(b)(1) and (b)(2): that the information be given "in-person" to the woman seeking the abortion. 10 G.C.A. § 3218.1(b)(1)-(2). Finding the "in-person" mandate prevents them from delivering the required information via teleconference, Plaintiffs filed suit challenging the in-person requirements of Section 3218.1 as violating a woman's right to an abortion. They now seek a preliminary injunction to enjoin the Attorney General of Guam and the members of the Guam Board of Medical Examiners ("Defendants") from enforcing the in-person requirements of 10 G.C.A. § 3218.1. ECF Nos. 12, 13.

---

by requiring all abortion procedures to be performed in a clinical setting. The parties have since stipulated that Section 31.20 does not prohibit medication abortions administered through telemedicine. ECF Nos. 26, 27.

## II. LEGAL STANDARD

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citations omitted). To obtain a preliminary injunction, Plaintiffs must show they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). However, the "most important" factor is whether Plaintiffs show they are likely to succeed on the merits of their claim; if a movant fails to meet this "threshold inquiry," the court "need not consider the other factors." *Disney Enter., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (internal quotations omitted).

## III. ANALYSIS

### a. Likely to Succeed on the Merits

Supreme Court and Ninth Circuit precedent unequivocally establish that a woman has a constitutional right to an abortion. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 874 (1992); *Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 911-12 (9th Cir. 2014). While a state may enact regulation to reflect a valid state interest, such as promoting fetal life and/or maternal health, any law creating an "undue burden" on a woman seeking an abortion is unconstitutional. *Casey*, 505 U.S. at 872-74; *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007). "In order to show an undue burden, plaintiffs must show that, 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.'" *Humble*, 753 F.3d at 914 (citing *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 539 (9th Cir. 2004) (quoting *Casey*, 505 U.S. at 895) (alteration in *Eden*)).

To determine whether a regulation presents a substantial obstacle, the court is to "compare the extent of the burden a law imposes on a woman's right to abortion with the strength of the state's justification for the law." *Humble*, 753 F.3d at 912. "The more substantial the burden, the stronger the state's justification for the law must be to satisfy the undue burden test; conversely, the stronger the state's justification, the greater the burden may be before it becomes 'undue.'" *Id.*

As a preliminary issue, Defendants appear to contend that the undue burden test only applies to laws purporting to ensure maternal health.[2] Defendants argue that Section 3218.1 is mainly reflective of Guam's interest in promoting and respecting fetal life, and thus assert the undue burden test is inapplicable.

For one, this court doubts Defendants' assertion that the in-person requirements in Section 3218.1 only reflect Guam's interest in promoting fetal life. Maternal health is referenced in the title: "Women's Reproductive Health Information Act of 2012." Additionally, in describing the legislative intent behind the bill, the Guam Legislature found it "essential to the psychological and physical well-being of a woman considering an abortion that she receives complete and accurate information material to her decision of whether to undergo an abortion including information concerning abortion alternatives." Bill No. 52-31, 2011 Regular Sess. (Guam Leg. 1992).[3]

---

[2] This argument relates to the parties' dispute regarding *June Medical Services L. L. C. v. Russo*, 140 S. Ct. 2103 (2020) and the proper formulation of the undue burden test. *June Medical* splintered the Court and has resulted in a circuit split, based on differing interpretations of Chief Justice Roberts's concurrence. *Compare Whole Woman's Health v. Paxton*, 972 F.3d 649 (5th Cir. 2020), *with EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 978 F.3d 418 (6th Cir. 2020), *Hopkins v. Jegley*, 968 F.3d 912 (8th Cir. 2020), *and Little Rock Family Planning Serv. v. Rutledge*, 984 F.3d 682 (8th Cir. 2021). While the Ninth Circuit has not yet analyzed the meaning of *June Medical*, the Ninth Circuit expressly held in *Humble* that the undue burden test "requires us to weigh the extent of the burden against the strength of the state's justification in the context of each individual statute or regulation." 753 F.3d at 914. Therefore, this court applies the undue burden test as articulated in *Humble*.

[3] Available at https://www.guamlegislature.com/Bills_Passed_31st/SBill%20No.%20B052-31%20(COR)%20passed.pdf.

Regardless, the court rejects any argument that the appropriate test varies depending on the state interest asserted. *Casey* explicitly stated that the undue burden test was a "standard of general application" and then used the undue burden standard to analyze state regulations that purportedly reflected the state's interests in both promoting fetal life and ensuring maternal health. *Casey*, 505 U.S. at 876–77. Other courts have held the undue burden standard is applicable to all abortion regulations, no matter the state interest asserted. *See, e.g.*, *Planned Parenthood of Indiana and Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health*, 896 F.3d 809, 817 (7th Cir. 2018), *cert. granted, judgment vacated sub nom. Box v. Planned Parenthood of Indiana and Kentucky, Inc.*, 141 S. Ct. 184 (2020); *West Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310, 1326 (11th Cir. 2018); *EMW Women's Surgical Center, P.S.C. v. Friedlander*, 960 F.3d 785, 796 (6th Cir. 2020), *reh'g en banc dismissed*, 831 Fed. Appx. 748 (6th Cir. 2020), *cert. granted in part sub nom. Cameron v. EMW Women's Surgical Ctr.*, 20-601, 2021 WL 1163735 (U.S. Mar. 29, 2021).

Consequently, the court will analyze whether the in-person requirements of Section 3218.1 impose an undue burden on women seeking an abortion on Guam by weighing the burdens imposed by the law against the benefits provided by the law.

### Burdens of Section 3218.1

From the perspective of Plaintiffs, the in-person requirement imposes a significant burden on the practice of mailing abortion prescriptions after teleconferencing with patients from their offices in Hawaii. To comply with Section 3218.1, Plaintiffs would need to travel to Guam themselves, or ensure the patient receives the information in-person from a qualified individual on Guam.

However, the undue burden standard does not focus on the burdens of Section 3218.1 as felt by Plaintiffs in Hawaii. The question is the burden Section 3218.1 has on a woman

attempting to obtain an abortion in Guam. From that perspective, compliance with Section 3218.1 requires a single trip to a qualified person's office in Guam—and in some cases, the trip is not even an additional trip. Some women first need to obtain ultrasounds or other tests before the abortion and could receive the information in-person during that visit. Plaintiffs argue that this single extra visit imposes an undue burden by creating logistical challenges involving travel, time off work, and childcare. Plaintiffs also argue that the in-person requirement forces the patient to disclose her decision to a person other than the telemedicine provider, which is particularly burdensome given the stigma against abortion on Guam.

### *Benefits of Section 3218.1 and Guam's Legitimate Interests*

Instead of relying on maternal health benefits, Defendants argue that Section 3218.1 furthers the state's interest in promoting fetal life. They argue that Section 3218.1 reflects the "qualitative differences [of] in-personal communication between meeting someone up close and in the flesh, versus speaking to their reduced-size image on a video screen." Defs.' Am. Opp'n 19, ECF No. 29. These qualitative differences relate to Guam's interest in promoting fetal life by ensuring that the information "makes the most impactful impression possible and to set a pensive tone for the woman's deliberation over the next 24 hours before the procedure." Defs.' Am. Opp'n 14-20, ECF No. 29. Defendants similarly contend that in-person meetings set the stage for a woman "to apprehend the full consequences" of a decision that has "profound and lasting meaning." *Id.* at 18.

The Ninth Circuit has recognized that within "the context of a law purporting to promote fetal life, whatever obstacles that law places in the way of women seeking abortions logically serve the interest the law purports to promote—fetal life—because they will prevent some women from obtaining abortions." *Eden*, 379 F.3d at 540. Stated differently, abortion regulations further the state's interest in promoting fetal life simply by reducing the number of abortions that

may occur. Within the context of telemedicine, the in-person requirement creates an extra step in the medication abortion process on Guam which may result in fewer abortions, thereby reflecting Guam's interest in promoting fetal life.

Plaintiffs argue that meeting in-person provides no benefit and is not reasonably related to a legitimate state interest. Pls.' Reply 8, ECF No. 30. Plaintiffs contend the law prevents patients from receiving information from the actual physician providing the abortion, who "is the most qualified to ensure that the patient fully understands the information provided." Pls. Reply 8:13-14, ECF No. 30. But this argument is not supported by the record or the text of Section 3218.1. The in-person requirement mandates that a patient receive pre-abortion information in-person, but it does not bar Plaintiffs from also supplying the information over teleconference.

To support their position that in-person communication provides no more benefit than videoconferencing, Plaintiffs submit an affidavit from a social psychology professor explaining that in-person communication is not inherently more "effective, impactful, powerful, or rich than communication through a synchronous audio-video medium" and that videoconferencing may even "enhance the communicative process by providing a "unique window into their patients' lives that is not necessarily possible in a clinical setting." Huntsinger Aff. 3:14-16, 7:1-17, ECF No. 30-1; Pls.' Reply 12:14-18, ECF No. 30. Another affidavit, provided by a board-certified OB/GYN practicing in Oregon and Montana, suggests videoconferencing is just as effective as in-person meetings for purposes of treating patients and obtaining informed consent. Nichols Aff. 2:14-18, ECF No. 30-2.

From a medical point of view, these arguments may be true. As a legal matter, however, Supreme Court law does not require that the state ensure that telemedicine patients receive the information from the best source (treating physician) by the most practical method (videoconferencing). The question is whether the state has a legitimate interest in the law and

whether the law unduly burdens a woman's access to an abortion. *Casey*, 505 U.S. at 885. State "[r]egulations which do no more than create a structural mechanism by which the State … may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose." *Id.* at 877. The "state may 'regulat[e] the medical profession in order to promote respect for life,' so long as the state does not act irrationally or 'impose an undue burden' on a woman's right to abortion." *Humble*, 753 F.3d at 912 (quoting *Gonzales*, 550 U.S. at 158).

Although Defendants' arguments about the superiority of in-person communication may not be supported by affidavits from health professionals, common sense and case law suggest a face-to-face interaction is one of the best communication methods in a variety of situations and for a variety of reasons. *Parenthood Arizona, Inc. v. Am. Ass'n of Pro-Life Obstetricians & Gynecologists*, 257 P.3d 181, 194 (Ariz. Ct. App. 2011) ("Courts have long recognized that 'eye-to-eye, face-to-face' interaction is superior to even videoconferencing") (listing cases). Guam could reasonably conclude that this personal method of communication creates a more pensive tone that promotes informed deliberation over the 24-hour period before the important final decision to abort fetal life. Accordingly, the court cannot conclude that in-person communication provides no benefit to Guam's stated interest.

### *Weighing of Burdens Against Benefits*

In this case, Section 3218.1 attempts to promote respect for fetal life by imposing the structural mechanism of the in-person visit. Courts have analyzed similar state requirements and have concluded they do not create undue burdens. In *Casey*, the mandatory, 24-hour waiting period at issue had the practical effect of requiring "at least two visits to the doctor." 505 U.S. at 886. This increased "the exposure of women seeking abortions to 'the harassment and hostility of anti-abortion protestors demonstrating outside a clinic,'" burdened women with long travel

distances, and created difficulties for women having to explain lengthy absences to their husbands or employers. *Id.* (internal quotations omitted). Despite these "troubling" findings, the Supreme Court held the requirement did not unduly burden a women seeking an abortion, as "under the undue burden standard a State is permitted to enact persuasive measures which favor childbirth over abortion, even if those measures do not further a health interest." *Id.* (emphasis added).

In other cases, logistical issues inherent to in-person requirements did not constitute undue burdens either. *See, e.g.*, *Cincinnati Women's Ser., Inc. v. Taft*, 468 F.3d 361, 373 (6th Cir. 2006) (finding law requiring an in-person meeting with a physician at least 24-hours prior to the abortion for informed consent purposes did not pose an undue burden); *Karlin v. Foust*, 188 F.3d 446, 483-88 (7th Cir. 1999) (finding that requirement of a face-to-face meeting between the attending physician and the woman 24 hours before the abortion procedure was not facially an undue burden even though it would create obstacles in the form of "increased costs for travel, lodging, and child care, loss of confidentiality for women who are closely monitored and controlled by abusive partners, and delays that are in actuality longer than twenty-four hours because of the limited number of physicians performing abortions"); *Fargo Women's Health Org. v. Schafer*, 18 F.3d 526, 532 (8th Cir. 1994) (finding a law requiring one in-person visit did not facially present an undue burden).

On the other end of the spectrum, laws that created an undue burden did so because they severely affected access to an abortion. For example, the Texas state laws at issue in *Whole Woman's Health v. Hellerstedt* cut the number of abortion facilities in half. 136 S. Ct. 2292, 2296 (2016), as revised (June 27, 2016). As a result, the "number of women of reproductive age living more than 50 miles from a clinic has doubled, the number living more than 100 miles away has increased by 150%, the number living more than 150 miles away by more than 350%, and the

number living more than 200 miles away by about 2,800%." *Id.* at 2296. And in *Humble*, an Arizona regulation banning off-label medication abortions was comparable to a regulation in Ohio that had resulted in almost a 65 percent decrease in the number of medication abortions. 753 F.3d at 916. Furthermore, the law would have required women to make, on average, a 321-mile round trip to obtain an on-label abortion, which was not even as safe as the off-label version.

Here, the logistical challenges imposed by the in-person requirements of Section 3218.1 are not well-delineated. Plaintiffs do not provide evidence that the in-person requirement has a significant effect on the cost or supply of abortions providers on Guam. The record indicates that there are several healthcare providers willing to provide pre- and post- abortion services. Compl. ¶¶ 66-67, ECF No. 1. It is not clear at this point in the case whether these providers could fulfill the in-person requirement, but logic dicates that they could.

Although Plaintiffs assert that because of the in-person requirement, women seeking an abortion must travel thousands of miles by air to obtain an abortion, the record does not support this assertion. After Section 3218.1 was enacted in 2012, the number of abortion providers and the number of abortions did not decrease. Defs.' Am. Opp'n 13, ECF No. 29 (there was "no appreciable decrease in the number of abortions on Guam following [the passage of § 3281.1]"). Abortion numbers only decreased when the last abortion physician on Guam retired in 2018. Thus, the burdens felt by women on Guam seeking an abortion appear to be attributable to the fact that there are no abortion providers on Guam, rather than the in-person requirements of Section 3218.1.

Finally, Plaintiffs did not submit evidence or argue that childcare costs, time off from work and travel within Guam present undue burdens. Guam is a relatively small island at approximately 30 miles long and 8.5 miles wide at the widest part, with a total area of 212 square

miles. The logistical issues created by other state laws requiring more trips to the doctor dwarf the logistical issues created on Guam for a similar requirement.

This analysis would be different if Section 3218.1 prevented medication abortion via telemedicine from happening on Guam or banned Plaintiffs from seeking affiliates on the island to provide the in-person requirement. Instead, Section 3218.1 only prevents Plaintiffs from conducting the entire process from Hawaii. While Plaintiffs would rather proceed with the entire process over telemedicine, "the law need not give abortion doctors unfettered choice in the course of their medical practice." *Gonzales*, 550 U.S. at 163. In light of the parties' stipulation about the application of 9 G.C.A. § 31.20 (ECF Nos. 26, 27), medication abortions via telemedicine are possible for women on Guam. Here, Section 3218.1 only precludes medication abortions provided **entirely** by telemedicine.

Plaintiffs next contend that that the in-person requirement would force women to reveal to others that they are seeking an abortion. But the statute only requires disclosure to the treating physician or a "qualified person," defined as "an agent of the physician who is a psychologist, licensed social worker, licensed professional counselor, registered nurse, or physician." 10 G.C.A. § 3218.1(a)(13). Plaintiffs themselves have represented there are parties on Guam willing to provide pre- and post-abortion care, as some women who obtain a medication abortion will require testing to determine the stage of pregnancy and some will need in-person, follow up care to complete the abortion. *See* Compl. ¶¶ 137-38, ECF No. 1. While some women will not need this pre- and post-abortion care and some may not wish to disclose their intent to have an abortion during the pre-abortion testing, requiring a patient to nonetheless receive the required information in-person on Guam from a qualified person and agent of the treating physician is not an undue burden creating a substantial obstacle to an abortion.

Lastly, this type of disclosure is not the type that poses an undue burden. *Cf. Eden*, 379 F.3d at 551 (analyzing an abortion regulation that gave a state health agency broad access to unredacted patient medical records, allowed the agency to retain copies in their offices, and required abortion providers to submit to a private contractor copies of fetal ultrasound prints); *Planned Parenthood Minnesota, North Dakota, South Dakota v. Daugaard*, 799 F. Supp. 2d 1048, 1053, 1060 (D.S.D. 2011) (analyzing an abortion law requiring disclosure to a "pregnancy help center" which, in reality, was a "hostile environment" as its mission was to "help a pregnant mother maintain her relationship with her unborn child").

In sum, the balance between the limited burden of one in-person visit on Guam as compared to Guam's asserted interest is a close call. But under *Humble*, "[t]he more substantial the burden, the stronger the state's justification for the law must be to satisfy the undue burden test; conversely, the stronger the state's justification, the greater the burden may be before it becomes 'undue.'" 753 F.3d at 912. Here, while the benefits are slight, the burdens are also slight and not well-established on the current record. Given that Plaintiffs carry the burden of persuasion, the court cannot conclude that the justification for the law is outweighed by the burdens for purposes of a preliminary injunction. Accordingly, the court finds the first factor does not weigh in Plaintiffs' favor.[4]

### b. Likely to Suffer Irreparable Harm without Preliminary Relief

The "most important" factor for a preliminary injunction is whether Plaintiffs are likely to succeed on the merits of their claim; if a movant fails to meet this "threshold inquiry," the

---

[4] Plaintiffs also take issue with Section 3218.1's requirement that the information to be "provided to the woman individually and in a private room to protect her privacy and maintain the confidentiality of her decision and ensure that the information focuses on her individual circumstances and that she has an adequate opportunity to ask questions." *Id.* at § 3218.1(b)(4). They argue this is inapplicable within the context of a medication abortion via telemedicine. Plaintiffs' requested relief for the "individually and in a private room" requirement is intertwined with the provision of medication abortion entirely by telemedicine. The court does not grant injunctive relief to prohibit the in-person requirement so it will not address the "individually and in private room" requirement.

court "need not consider the other factors." *VidAngel*, 869 F.3d at 856 (internal quotations omitted). As detailed above, the court finds this threshold inquiry was not met.

However, if the court were to analyze the irreparable harm alleged in this case, it would be a function of the analysis undertaken in the first factor. Plaintiffs argue that the irreparable injury in this case stems from the constitutional violations to the right to an abortion, while Defendants argue that Plaintiffs are not suffering from irreparable injury as Section 318.21 does not violate any constitutional rights. This is simply a restatement of the arguments presented in the first factor. *See Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 712-11 (9th Cir. 1997), *as amended on denial of reh'g and reh'g en banc* (Aug. 21, 1997), *as amended* (Aug. 26, 1997) (holding that because there was no constitutional violation, there was no threat of irreparable harm). As the court finds Plaintiffs are not likely to succeed on the merits, it similarly concludes irreparable injury is unlikely.

## IV. Balance of Equities and Public Interest

When the government is a party as is the case here, "these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). As it is always in public interest to prevent the violation of constitutional rights, Plaintiffs assert this factor weighs in their favor as Guam law violates the right to an abortion. The validity of this argument rests on whether constitutional rights are being violated in the first place—namely, whether the burden imposed by the law outweighs the state's justification for the law—which is the same issue presented in asking whether Plaintiffs have a likelihood of success on the merits. As the court finds that Plaintiffs are not likely to succeed on the merits, it similarly concludes that the balance of equities and the interest of the public do not weigh in favor of granting the preliminary injunction.

## V. CONCLUSION

The undue burden test asks the court to weigh the benefits provided by the in-person elements of Section 3218.1 against its burdens. Here, while the health benefits are minimal, the court cannot say the burdens as set forth on this record outweigh Guam's interest in promoting fetal life. Consequently, the court finds that Plaintiffs fail to carry the burden of persuasion to obtain a preliminary injunction.

Consequently, the court **RECOMMENDS** that the motion for preliminary injunction be **DENIED**.

DATE: April 23, 2021

HEATHER L. KENNEDY
Magistrate Judge

**NOTICE**
**Failure to file written objections to this Report and Recommendation within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking such Report and Recommendation before the assigned United States District Judge. 28 U.S.C. § 636(b)(1)(B).**