**THE DISTRICT COURT OF GUAM**

| | |
|---|---|
| SHANDHINI RAIDOO, *et al.*, | CIVIL CASE NO. 21-00009 |
| Plaintiffs, | |
| vs. | **DECISION AND ORDER**<br>**RE PLAINTIFFS' OBJECTIONS TO THE**<br>**REPORT AND RECOMMENDATION ON**<br>**PLAINTIFFS' MOTION FOR**<br>**PRELIMINARY INJUNCTION** |
| LEEVIN TAITANO CAMACHO, *et al.*, | |
| Defendants. | |

Before the court is Plaintiffs' Objections to the U.S. Magistrate Judge's Report and Recommendation on Plaintiffs' Motion for Preliminary Injunction. For the reasons stated herein, the court **SUSTAINS** Plaintiffs' Objections, **MODIFIES** the U.S. Magistrate Judge's Report and Recommendation, and **GRANTS** the Plaintiffs' Motion for Preliminary Injunction.

**I. Procedural Background**

On February 5, 2021, Plaintiffs filed a motion for preliminary injunction, and the court referred the matter to the U.S. Magistrate Judge. *See* ECF Nos. 12 and 17. The U.S. Magistrate Judge issued her Report and Recommendation on April 23, 2021. ECF No. 32.

Plaintiffs filed four objections to the Report and Recommendation, ECF No. 33, and a briefing schedule was issued, ECF No. 34. The court heard the matter on September 1, 2021, and took the Objections under advisement.

## II.  Factual Background

The parties did not object to the "Factual and Procedural Background" of the Report and Recommendation. As such, the following facts are taken from the Report and Recommendation.

Abortion has been a contentious issue for several decades in Guam and continues to be so today. The practice was criminalized up until 1978—when it was decriminalized pursuant to 9 G.C.A. § 31.20 in the wake of *Roe v. Wade*—only to be banned again by the Guam Legislature in 1990. Compl. ¶¶ 37, 39-40, 44, ECF No. 1; *see Roe v. Wade*, 410 U.S. 113 (1973). After the ban was challenged in court, the Ninth Circuit deemed the law unconstitutional. Compl. ¶¶ 45-55, ECF No. 1; *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366 (9th Cir. 1992), *as amended* (June 8, 1992), *cert. denied*, 506 U.S. 1011 (1992). Abortion has been legal on Guam ever since, and from 2008 to 2017, approximately 200-300 yearly abortions were performed. *See* Compl. ¶¶ 55-56, ECF No. 1.

In 2018, the last abortion physician on Guam retired, and no local doctor has stepped in to fill the vacancy. Thus, no known abortion has occurred on Guam since 2018. *Id.* ¶¶ 61-62, 71. While Plaintiffs claim there are physicians on Guam willing to provide pre- and post-abortion care, none are willing to provide abortion services directly, as "[a]nti-abortion stigma discourages even supportive local doctors from incorporating abortion services into their practice." *Id.* ¶¶ 65-67.

Enter the two Plaintiffs in this case, Plaintiffs are Guam-licensed, board-certified OB-GYNs experienced in providing abortion services. *Id.* ¶¶ 10-15. However, Plaintiffs do not reside on Guam. They reside in Hawaii. *Id.* They have brought this lawsuit seeking to remotely supply

"medication abortions" to patients on Guam through telemedicine. As described by Plaintiffs, a medication abortion is different from other abortion procedures performed in clinics by a doctor because it is entirely self-administered by the patient herself. *Id.* ¶ 134. To obtain the medication abortion, the patient orally ingests a regimen of mifepristone, and then misoprostol, approximately 24-48 hours apart. *Id.* ¶ 130. The medication causes the fetal tissue to detach from the uterine wall, which is then expelled through the uterus, mimicking an early miscarriage. *Id.* ¶ 131.

Normally, a woman would need to receive abortion medication in-person. However, an ongoing FDA-approved clinical study has allowed certain doctors to send abortion medication directly to patients. *Id.* ¶¶ 133, 164-69. Consequently, Plaintiffs have generally administered medication abortions entirely by telemedicine. *Id.* ¶¶ 12, 15, 164-66. Under this model, Plaintiffs conduct initial and follow up-consultations via teleconference and deliver the medication by mail, but never meet with the patient in-person. *Id.* ¶¶ 151, 169. If any in-person procedures are necessary, such as ultrasounds or lab tests, the patient undergoes the procedure at nearby medical facilities. *Id.*

The record demonstrates that medication abortion is safe. The chance of a major adverse health event is "exceedingly rare, generally far below 0.1%." *Id*. ¶ 136. Still, in about 1-5% of cases, the process results in an "incomplete abortion," and in about 0.8-2.9% of cases, the process results in an "ongoing pregnancy." *Id.* ¶¶ 137-38. In the case of an incomplete abortion or ongoing pregnancy, an in-person procedure may be required to complete the abortion, although sometimes this can be performed remotely. *Id.* Follow-up visits are encouraged after the medication abortion to ensure the medication abortion was successful, either via telemedicine or in-person. *Id.* ¶¶ 185-87.

Medication abortion is usually only available for up to 10 to 11 weeks of the pregnancy. *Id.* ¶ 135. A woman's eligibility for a medication abortion must sometimes be determined by way of ultrasounds and lab results to confirm the existence and duration of the pregnancy and/or rule out ectopic pregnancies. *Kaneshiro Decl.* at ¶¶ 50-56, ECF No. 13-4; *Raidoo Decl.* at ¶¶ 49-56, ECF No. 13-5. This pre-abortion testing is not medically necessary for all women, and some women already have this information by the time they begin seeking an abortion. *Id.*

Plaintiffs seek to provide medication abortion on Guam from Hawaii via telemedicine. But they allege that they are prevented from doing so by 10 G.C.A. § 3218.1. While not explicitly banning medication abortion, § 3218.1 requires "the physician who is to perform the abortion or a qualified person" to provide a woman seeking an abortion information that "a reasonable person would consider material to the decision of whether or not to undergo the abortion" at least twenty-four hours before the abortion is set to occur. § 3218.1(b)(1)(B). This information includes "a description of the abortion method," the risks it poses, the "probable gestational age of the unborn child," the "probable anatomical and physiological characteristics of the child," public assistance available to support the child, available adoption services, and the legal responsibilities of the father. § 3218.1(b)(1)-(2).

The law imposes misdemeanor criminal penalties and creates private causes of action against physicians who violate these requirements. § 3218.1(f)-(g). The Guam Board of Medical Examiners may initiate disciplinary action, including the revocation or suspension of the physician's medical license, for violations of Section § 3218.1. § 12209(d).

Plaintiffs do not challenge the nature of the information to be given. Nor do they challenge the twenty-four-hour waiting period. What Plaintiffs do take issue with is the two-word requirement injected at the end of the opening lines of Section § 3218.1(b)(1) and (b)(2): that the information be given "in-person" to the woman seeking the abortion. 10 G.C.A. § §

3218.1(b)(1)-(2). Finding the "in-person" mandate prevents them from delivering the required information via teleconference, Plaintiffs filed suit challenging the in-person requirements of Section § 3218.1 as violating a woman's right to an abortion. They now seek a preliminary injunction to enjoin the Attorney General of Guam and the members of the Guam Board of Medical Examiners ("Defendants") from enforcing the in-person requirements of 10 G.C.A. § § 3218.1. Pl.'s Mot. and Mem. in Support of Mot., ECF Nos. 12 and 13.

### III. Magistrate Judge's Report and Recommendation

The U.S. Magistrate Judge used the "undue burden" balancing test as articulated in *Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905 (9th Cir. 2014).[1]

> "In order to show an undue burden, plaintiffs must show that, 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.'" *Humble*, 753 F.3d at 914 (citing *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 539 (9th Cir. 2004) (quoting *Casey*, 505 U.S. at 895) (alternation in *Eden*)).

> To determine whether a regulation presents a substantial obstacle, the court is to "compare the extent of the burden a law imposes on a woman's right to abortion with the strength of the state's justification for the law." *Humble*, 753 F.3d at 912. "The more substantial the burden, the stronger the state's justification for the law must be to satisfy the undue burden test; conversely, the stronger the state's justification, the greater the burden may be before it becomes 'undue'". *Id.*

R. & R. at 5-6, ECF No. 32.

In examining the burdens of the statute in question, the Report and Recommendation focused on the burden the statute has on a woman seeking abortion *in Guam*. "From that perspective," the Report and Recommendation reasoned that "compliance with Section 3218.1

---

[1] As noted in the Report and Recommendation, the parties disputed the application of *June Medical Services L.L.C. v. Russo*, 140 S. Ct. 2103 (2020), and the proper formulation of the undue burden test. *See* R. & R. at 6 n.2, ECF No. 32. However, neither parties filed an objection to the Magistrate Judge's use of the benefit-burden analysis.

requires a single trip to a qualified person's office in Guam—and in some cases, the trip is not even an additional trip[,]" since some women could get the required in-person information at the time they get their ultrasound or other tests before the abortion. *Id.* at 8.

In examining the benefits of the statute, the Report and Recommendation stated that "abortion regulations further the state's interest in promoting fetal life simply by reducing the number of abortions that may occur[,]" relying on *Eden*. *Id.* at 8-9. By requiring that information be given in person, that creates an additional step that may result in less abortion, "thereby reflecting Guam's interest in promoting fetal life." *Id.* at 9.

Further, "common sense" dictates that in-person communication is "one of the best communication methods." *Id.* at 10. "Guam could reasonably conclude that this personal method of communication creates a more pensive tone that promotes informed deliberation" prior to abortion. *Id.* As such, the Report and Recommendation found that the in-person requirement may have benefit to Guam's stated interest. *Id.*

Citing *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833 (1992); *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361 (6th Cir. 2006); *Karlin v. Foust*, 188 F.3d 446 (7th Cir. 1999); and *Fargo Women's Health Org. v. Schafer*, 18 F.3d 526 (8th Cir. 1994), the Report and Recommendation did not find that the in-person requirement created an undue burden. *Id*. at 10-11. The Report and Recommendation reasoned that (1) it is unclear whether the pre- and post-abortion providers in Guam could fulfill the in-person requirement; (2) the burden of a woman having to travel outside of Guam for abortion is not itself due to the in-person requirement but rather, it is the result of lack of abortion providers on island; (3) there is no evidence that childcare costs, time off from work, and travel within Guam cause undue burden;

and (4) the information can be provided by a "qualified person"[2] and not necessarily by the abortion provider. *Id*. at 12-13.

As to the question of irreparable harm, balance of equities and public interest, because the Report and Recommendation found that there is likely no constitutional violation, *i.e.*, the statute does not create an undue burden, it similarly concluded that these three remaining factors weigh in favor of the Defendants. *Id.* at 15.

## IV. Standard of Review

When a party files a timely objection to a magistrate judge's report and recommendation, "[a] judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*

## V. Legal Standard on Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). "When the government is a party, these last two factors merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## VI. Discussion[3]

### a. Objection No. 1

As noted above, in weighing the benefits of the statute, the Report and Recommendation relied on *Eden* and stated that "abortion regulations further the state's interest in promoting fetal

---

[2] "Qualified Person" is defined as "an agent of the physician who is a psychologist, licensed social worker, licensed professional counselor, registered nurse, or physician." 10 G.C.A. § 3218.1(a)(13).
[3] The page citation is based on the CM/ECF's page numbering.

life simply by reducing the number of abortions that may occur. Within the context of telemedicine, the in-person requirement creates an extra step in the medication abortion process on Guam which may result in fewer abortions, thereby reflecting Guam's interest in promoting fetal life." R. & R. at 8-9, ECF No. 32. Plaintiffs object to this analysis, the misapplication of *Eden*, and "[t]o the extent the Magistrate Judge relied on this as a benefit when weighing the benefits against the burdens, the balancing was done erroneously." Pls.' Obj. at 5, ECF No. 33. The court SUSTAINS Plaintiffs' Objection No. 1.

In *Tucson Woman's Clinic v. Eden*, the state of Arizona singled out abortion clinics requiring them to the same licensing requirements imposed on health care institutions to protect maternal health. 379 F.3d 531, 536-37 (9th Cir. 2004). The plaintiffs challenged the regulation, arguing, among other things, that it poses an undue burden on the right to abortion. *Id.* The Ninth Circuit analyzed whether the "undue burden" standard applies in the context of promoting maternal health and not just in the context of promoting fetal life. *Id.* at 539. It found that it does. *Id.*

The Ninth Circuit observed that laws purporting to promote fetal life would "logically serve the interest the law purports to promote—fetal life—because they will prevent some women from obtaining abortions" and laws purporting to promote maternal health "can both place obstacles in the way of women seeking abortions *and* fail to serve the purported interest[.]" *Id.* at 40 (emphasis in original). This observation was purely *dicta* as the appellate court analyzed whether laws purporting to promote maternal health *triggers* the "undue burden" standard. *Eden* did not analyze whether the regulation in question was an undue burden.

The Report and Recommendation's reliance on *Eden* as it weighed the benefits of Section 3218.1 was improper. The Supreme Court has held that "the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it."

*Casey*, 505 U.S. at 877. Put in another way, "a state may advance its legitimate interest in potential life by enacting measures designed to ensure that a woman's choice is informed and mature as long as the purpose of such measures is to persuade the woman to choose childbirth over abortion rather than to prevent the woman from exercising her right to choose." *Karlin*, 188 F.3d at 493 (citing *Casey*, 505 U.S. at 877-78). To say that Section 3218.1 furthers the state's interest in promoting fetal life—because it reduces abortion rates by creating an additional step of in-person requirement—would be in complete contradiction to the Supreme Court's holding.

Defendants fail to directly address Plaintiffs' Objection No. 1. Instead of discussing the benefits versus the burdens, Defendants appear to confuse the applicable balancing test for "undue burden" with rational basis review. This is apparent when Defendants' argument consistently goes back to the burden not being "substantial" without anything more (no discussion of the strength of the state's justification) and that the statute is "not irrational and does not impose a substantial obstacle to a woman's right to choose." Defs.' Opp'n. at 6, ECF No. 35 (emphasis in original omitted). As noted above, in reviewing whether the statute presents a substantial obstacle, the court must "compare the extent of the burden a law imposes on a woman's right to abortion with the strength of the state's justification for the law." *Humble*, 753 F.3d at 912. The two—burden and state justification—cannot be divorced from each other.

Here, Defendants fail to rebut Plaintiffs' argument that the in-person requirement serves no benefit to a legitimate state interest. Defendants argue that Plaintiffs can still accomplish the statutory requirement by affiliating themselves with a qualified person to conduct the in-person visit, while noting that nothing is preventing Plaintiffs from also participating by videoconference when the in-person visit is conducted. Defs.' Opp'n. at 2 n.1, ECF No. 35. This argument is precisely why Plaintiffs are correct in their argument that "*forcing* the in-person visit, when a live, face-to-face video conference is available," serves no benefit or advances any

legitimate state interests.[4] Pls.' Reply at 5, ECF No. 36 (emphasis in original). It is also precisely why the burdens the statute imposes are unjustified.

Further, Defendants argue that there is no substantial burden for women seeking abortion *in Guam*.[5] Defs.' Opp'n. at 4-5. Defendants' argument is completely detached from the reality that there is no abortion provider in Guam since the last one retired in 2018. *See* Compl. at ¶¶ 61-62, 71, ECF No. 1. A woman seeking abortion in Guam would have no choice but to travel outside of Guam. Raidoo Decl. at ¶¶ 69-70, 72-73, ECF No. 13-5. This is assuming that woman has the financial resources to do so, in addition to the logistical headaches of having to take time off from work, arranging for childcare, abiding by the COVID-19 quarantine and travel restrictions, among other things. *Id.* at ¶¶ 72-76. Traveling off island also makes it difficult for the woman to keep her abortion decisions confidential and risk exposure from her partner, especially those experiencing intimate partner violence ("IPV"). Washington Decl. at ¶¶ 47, ECF No. 13-3; Rawlings Decl. at ¶¶ 16-17, 23-24, ECF No. 13-6; Nichols Decl. at ¶ 65, ECF No. 13-2.  For those who do not have the resources to go off-island, they are left without a choice but to carry the pregnancy to full term.

"The more substantial the burden, the stronger the state's justification for the law must be to satisfy the undue burden test; conversely, the stronger the state's justification, the greater the burden may be before it becomes 'undue'". *Humble*, 753 F.3d at 912. In other words, the "feebler" the state's justifications, "the likelier the burden, even if slight, to be 'undue''. *Id.* at 914 (citing *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 798 (7th Cir. 2013)).

---

[4] The issue of whether in-person is superior to video conference will be discussed *infra*.

[5] Defendants cite to the Report and Recommendation, describing Guam as "a relatively small island at approximately 30 miles long and 8.5 miles wide at the widest part, with a total area of 21 square miles[.]" Defs.' Opp'n. at 9, ECF No. 35.

Here, there are undisputed evidence of the burdens the law imposes on a woman seeking abortion in Guam. It is unclear what the state's justification is for the in-person requirement since Defendants did not clearly address this in their response brief, *see* Defs.' Opp'n. to Pls.' Obj. to R. & R., ECF No. 35, nor did they clearly address it at the hearing. It appears Defendants' justification is to promote fetal life, *see* Defs.' Opp'n. to Mot. for Prelim. Inj. at 17, ECF No. 29, when it cited to *Eden*. As discussed above, the reliance on *Eden* is misplaced. The other possible state justification is that in-person visit is superior to video conference. Even if this is the case, this justification is feeble and is easily outweighed by the burdens imposed on the woman seeking abortion.

### b. Objection No. 2

The Report and Recommendation acknowledged the evidence provided by Plaintiffs which demonstrates that in-person communication provides no more benefit than videoconferencing. R. & R. at 9, ECF No. 32. Despite the undisputed evidence on this issue, however, the Report and Recommendation concluded that common sense[6] "suggest a face-to-face interaction is one of the best communication methods in a variety of situations and for a variety of reasons." *Id.* at 10. Based on this conclusion, the Report and Recommendation further noted that "Guam could reasonably conclude that this personal method of communication creates a more pensive tone that promotes informed deliberation over the 24-hour period before he important final decision to abort fetal life." *Id.* Plaintiffs object to the Report and Recommendation's reliance on Defendants' counsel's *ipse dixit* on the superiority of in-person

---

[6] Aside from commonsense, the Report and Recommendation also relied on an Arizona state appellate court stating that in-person communication is superior to videoconferencing. R. & R. at 10, ECF No. 32 (citing *Parenthood Arizona, Inc. v. Am. Ass'n of Pro-Life Obstetricians & Gynecologists*, 257 P.3d 181, 194 (Ariz. Ct. App. 2011)). First, there is uncontroverted evidence before this court that says otherwise. Second, as Plaintiffs correctly point out, the question before the Arizona state appellate court is whether "the legislature could reasonably conclude that *telephonic* consultation was inferior to in-person consultation during which the interviewer could perceive the condition and comportment of the patient[.]"*Am. Ass'n of Pro-Life Obstetricians & Gynecologists*, 257 P.3d at 194. *See* Pls.' Obj. to R. & R. at 10 n.7, ECF No. 33. That is not the case here.   !

1    communication and so-called "common sense." Pls.' Obj. at 5, ECF No. 33. The court

2    SUSTAINS Plaintiffs' Objection No. 2.

3         The evidence from Plaintiffs includes expert testimony from Dr. Jeffrey Huntsinger,

4    PhD., and Dr. Mark Nichols, M.D. Huntsinger is an associate professor in Social Psychology at

5    Loyola University Chicago, with a Ph.D. in Psychology from the University of Virginia.

6    Huntsinger Rebuttal Decl. at ¶¶ 1-2, ECF No. 30-1. Huntsinger states that "the evidence shows

7    that engagement in interpersonal communication, including for purposes of providing

8    information or counseling, via live face-to-face video conference is comparable to, and may even

9    have some benefits over, in-person communication in terms of impact, outcomes, and

10   experience." *Id.* at ¶ 24. In fact, "communication via synchronous audio-video technology has

11   the capacity to enhance the power, impact, and effectiveness of the communicative experience

12   by ensuring that parties to the communication are in a setting where they feel comfortable, safe,

13   and secure to engage in the communication, and by providing a visual window into that setting

14   that could bolster the development of mutual understanding and shared connection." *Id.* His

15   testimony is based on his education, training, teaching experience as a psychologist, familiarity

16   with the relevant scientific research and literature (research and literature on interpersonal

17   communication, telemedicine, and teletherapy), attendance at professional conferences, as well

18   as conversations with other social psychologists, therapists and clinical psychologists. *Id.* at ¶ 7.

19        Nichols is a board-certified obstetrician-gynecologist licensed to practice in the states of

20   Oregon and Montana, with a medical degree from the University of California, Davis. Nichols

21   Decl. at ¶¶ 1-2, ECF No. 13-2. He has over three decades of experience in his medical field,

22   including having served various academic and leadership positions at the Oregon Health

23   Sciences University (OHSU) and in the medical community. *Id.* at ¶ 3-9. In his expert opinion,

24   "there is no evidence that in-person communications are inherently superior to live, face-to-face

telemedicine in ensuring that patients are well-informed." Nichols Rebuttal Decl. at ¶ 3, ECF No. 30-2. "Research confirms that telemedicine is just as effective as in-person communications for informed consent conversations, with no differences in patient comprehension or understanding." *Id.* at ¶ 8. Nichols cites to a randomized controlled trial[7] of in-person and live, face-to-face videoconferencing telemedicine on informed consent conversations. "The study showed that patient comprehension of the information provided was virtually identical between patients who received the information through an in-person conversation and patients who received the information using live telemedicine." *Id.* at 9.

Defendants failed to offer any evidence that supports their position that in-person communication is superior to live, face-to-face video conference. Not one, single expert was offered by Defendants. Defendants also failed to offer any evidence to rebut Plaintiffs' evidence or question the credibility or qualifications of Plaintiffs' experts. Instead, Defendants made unsupported assertions of their position regarding their alleged superiority of in-person communication. *See* Defs.' Am. Opp'n. to Mot. for Prelim. Inj. at 26, ECF No. 29 ("[T]here is a distinct difference between counseling patients face-to-fact rather than over a video feed. . . . No other method shares the same capability for impact upon the psyche as does hearing information from, and communicating with, another human being who is physically present with you.").

"[T]he Court, when determining the constitutionality of laws regulating abortion procedures, has placed considerable weight upon evidence and argument presented in judicial proceedings." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2310 (2016), as revised (June 27, 2016). The Supreme Court found that it was not wrong of the district court in *Hellerstedt* to "give significant weight to evidence in the judicial record" and it is in fact

---

[7] "Randomized controlled trial" is the gold standard of study design, because "the design most effectively minimizes the risk of confounding factors influencing the results." Nichols Rebuttal Decl. at ¶ 10, ECF No. 30-2.

"consistent with [the Supreme Court's] case law." *Id.* The district court in *Hellerstedt* considered

the evidence in the record, "including expert evidence, presented stipulations, depositions, and

testimony. It then weighed the asserted benefits against the burdens." *Id.* "Courts are free to base

their findings on commonsense inferences *drawn from the evidence*." *Id.* at 2317 (emphasis

added).

Here, the Report and Recommendation acknowledged that Defendants did not provide

any evidence in support of their arguments about the superiority of in-person communication. R.

& R. at 10, ECF No. 32. Nonetheless, the Report and Recommendation found that in-person

communication may be superior to other methods of communication based on "common sense."

*Id.* However, the undisputed evidence before the court all points to the fact that a live, face-to-

face video conferencing is "comparable to, and may even have some benefits over, in-person

communication[.]" Huntsinger Rebuttal Decl. at ¶ 24, ECF No. 30-1. There is no evidence on the

record in which the court can draw inferences from as to the commonsense conclusion that in-

person communication is better than videoconferencing. Accordingly, the Report and

Recommendation erred in its finding.

### c. Objection No. 3

Plaintiffs' third objection is on the Report and Recommendation's holding that Plaintiffs

are unlikely to succeed on the merits of their claim. Pls.' Obj. at 10-15, ECF No. 33. The holding

was based on the erroneous reasonings discussed above. Accordingly, the court SUSTAINS

Plaintiffs' Objection No. 3.

The Report and Recommendation cited to four cases[8] wherein "logistical issues inherent

to in-person requirements did not constitute undue burden." R. & R. at 11, ECF No. 32. Plaintiffs

distinguished these cases as two not even imposing any in-person requirement at all and

---

[8] *Casey*, 505 U.S. 833; *Taft*, 468 F.3d 361; *Karlin*, 188 F.3d 446; and *Schafer*, 18 F.3d 526 (8th Cir. 1994).

permitting the required information to be provided over the telephone (*Casey* and *Schafer*); the other as the burden coming from having to require the physician to provide information and not the in-person requirement (*Taft*); and the last one was a facial challenge to the entire abortion informed consent statute and did not distinguish the state's interest in imposing an in-person requirement from its interest in imposing the 24-hour delay (*Karlin*). Pls.' Obj. to R. and R. at 13-14, ECF No. 33.

Nonetheless, even if these cases are not distinguishable, the controlling law provides that "the undue burden test is context-specific, and that both the severity of a burden and the strength of the state's justification can vary depending on the circumstances." *Humble*, 753 F.3d at 914. "While a twenty-four-hour waiting period that requires two trips to an abortion provider has been found not to impose an undue burden on Pennsylvania women based on the circumstances of that state at the time the Court decided *Casey*, a similar provision in another state's abortion statute could well be found to impose an undue burden on women in that state depending on the interplay of [record-specific] factors[.]" *Karlin*, 188 F.3d at 485. The Ninth Circuit emphasized that courts must "weigh the extent of the burden against the strength of the state's justification *in the context of each individual statute or regulation*." *Humble*, 753 F.3d at 914 (emphasis added).

As discussed above, the state justification here is lacking. The information required to be given to a woman seeking abortion at least 24-hours prior to the procedure can be provided via live, face-to-face video conferencing, and Defendants have not shown any real justification or benefits of the in-person requirement. Meanwhile, the burdens imposed by the in-person requirement are substantial.

### d. Objection No. 4

Plaintiffs' fourth and final objection is on the Report and Recommendation's holding that Plaintiffs are unlikely to satisfy the remaining preliminary injunction factors. Pls.' Obj. to R. &

R. at 15, ECF No. 33. The holding was based on the erroneous reasonings discussed above.

Accordingly, the court SUSTAINS Plaintiffs' Objection No. 4.

The remaining factors are whether there is irreparable harm in the absence of preliminary relief and whether the balance of equities tips in Plaintiffs' favor and is in the public's interest. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Further, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 1002 (citation and internal quotation marks omitted). As the court finds Plaintiffs are likely to succeed on the merits, it similarly finds Plaintiffs have met the remaining *Winter* factors.

## VII.   Section 3218.1's "individually and in a private room" requirement

In their Motion for Preliminary Injunction, Plaintiffs also take issue with Section 3218.1's requirement that the information be provided "individually and in a private room." *See* Mem. in Support of Pls.' Mot. for Prelim. Inj. at 37, ECF No. 13. Section 3218.1(b)(4) provides that the information be "provided to the woman individually and in a private room to protect her privacy and maintain the confidentiality of her decision and ensure that the information focuses on her individual circumstances and that she has an adequate opportunity to ask questions." 10 G.C.A. § 3218.1(b)(4). The Report and Recommendation did not address this issue. It found that the issue is "intertwined" with the in-person requirement and since the Report and Recommendation denied the in-person requirement, the "individually and in a private room" requirement is moot. R. & R. at 14 n.4, ECF No. 32.

Plaintiffs argue that the "individually and in a private room" requirement "simply do not apply in the context of telemedicine." Mem. in Support of Pls.' Mot. for Prelim. Inj. at 37, ECF No. 13. Further, Defendants note that this section does not preclude the woman from "bringing

whomever she wants (presumably a trusted friend or relative) into the room with her, because she holds the power to expand the zone of her informational privacy right to include, and allow disclosure to, whomever she chooses." Defs.' Opp'n. to Pls.' Mot. for Prelim. Inj. at 27, ECF No. 29.

This court agrees with the Report and Recommendation that the in-person requirement and the "individually and in a private room" requirement are "intertwined." Accordingly, because the court is granting Plaintiffs' injunctive relief to enjoin the in-person requirement, it is likewise granting injunctive relief to enjoin the "individually and in a private room" requirement.

**VIII.   Conclusion**

For the reasons stated above, the court SUSTAINS all four objections, MODIFIES the Report and Recommendation, and GRANTS the motion for preliminary injunction. The court will issue a separate order on the motion for preliminary injunction.

**SO ORDERED.**



**/s/ Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: Sep 03, 2021**